**243 A.2d 745.**

WINIFRED WILKINSON *vs.* PETER F. HARRINGTON.

PETER J. O'CONNELL, *Administrator vs.* PETER F. HARRINGTON.

WINIFRED WILKINSON *vs.* JOHN M. VESEY.

PETER J. O'CONNELL, *Administrator vs.* JOHN M. VESEY,

WINIFRED WILKINSON *vs.* RUSSELL R. HUNT.

PETER J. O'CONNELL, *Administrator vs.* RUSSELL R. HUNT.

JUNE 25, 1968.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. This is a petition for certiorari to review certain rulings of law made by a trial justice of the superior court. The writ was issued and in compliance therewith the superior court has duly certified and transmitted all its records in each case for our inspection.

The record discloses that the present controversy stems from six negligence actions for malpractice brought against the three respondents, all of whom are licensed medical practitioners of this state. Three of the original suits were filed by Winifred Wilkinson for injuries directly sustained by her while she was allegedly under the care and treatment of these doctors; the remaining three suits were brought by her husband, Allen, for consequential damages. Subsequent to the initiation of these actions, Allen Wilkinson died. His death was noted on the record and the administrator of his estate was substituted as a party plaintiff. Since the administrator's suits are dependent on Winifred's success, we shall refer only to the actions she has brought against the three doctors.

The petitioner in July, 1951 came under the treatment and care of the present respondents—two of whom are radiologists while the third is a chest specialist. She was referred to these respondents by her family physician. After

examining her, respondents diagnosed that petitioner was suffering from a malignant tumor located in the region of her chest. Radiation treatments were prescribed by the chest specialist and then administered by the radiologists for a period of time beginning on July 30, 1951 and ending approximately on January 21, 1952. The respondents contend that their examinations of petitioner subsequent to the radiation therapy disclosed that the malignancy had been arrested and she thereupon was referred back to her family physician.

Some time later petitioner's health began to deteriorate. In 1955 there appeared on petitioner's chest in the area where the x-ray cone had been aimed a small pinkish circle with a circumference about the "size of a dime." As time progressed, her condition worsened. The discolored circle on her chest gradually became larger and turned purple. Thereafter, petitioner's skin in this area blistered and these blisters broke and began weeping. This was followed by a breakdown of skin tissue which in turn led to an aperture in her chest. The aperture slowly grew until its circumference equaled that of a "quarter." To correct her exacerbating state of health petitioner has undergone approximately nine operations since her radiation treatments, some of which involved delicate skin grafting. There is no question that petitioner has sustained extraordinarily serious and complex injuries.

On April 26, 1962, petitioner commenced her action against respondents alleging that her injuries were a result of the negligent introduction of excessive amounts of X rays into her body. From this date, a procedural foray took place between counsel for petitioner and respondents which, if nothing else, served to bear cogent evidence of the salutary nature of simplified pleadings and discovery under the new rules of civil procedure of the superior court. The flow of declarations, demurrers and replications filed by the

respective parties was staunched in 1965 when the superior court in essence upheld respondents' contention that petitioner's suit was barred by the operation of the statute of limitations. In this petition for certiorari petitioner seeks to review the rulings made by the trial justice.

The precise question raised by the decision of the trial justice, couched in its simplest form, is when does our statute of limitations begin to run in a medical malpractice case. Is it from the moment when the alleged negligent treatment was given, as respondents contend, or is it, as petitioner urges, from the time when she discovered or, in the exercise of due care, should have discovered that she was the victim of the physicians' negligent conduct? Essentially the decision of the trial justice stands in support of the position espoused by respondents.

At the outset we wish to direct a comment to respondents' argument as to whether this case is a proper one for the issuance of our writ of common-law certiorari. It is true that a petition for review by a writ of certiorari is addressed to the discretion of this court and such a writ is withheld in those instances where the petitioner has another express remedy available to him to review any errors of law complained of. Concededly, certiorari does not ordinarily lie for those seeking review of interlocutory orders or decrees. *Cohen* v. *Superior Court,* 39 R. I. 272, 97 A. 794; *Parker* v. *Superior Court,* 40 R. I. 214, 100 A. 305. But in cases of unusual hardship and in the furtherance of justice this court has permitted the use of the writ of certiorari to supplement the method of review which the law expressly provides. *Parker* v. *Superior Court, supra.* On occasion, again in the interest of justice, this court has heretofore allowed certiorari to be utilized as a vehicle by which petitioners can obtain immediate review, even though another remedy would be available later. *Brickle* v. *Quinn,* 63 R. I. 120, 7 A.2d 890; *White* v. *White,* 70 R. I. 48, 36

A.2d 661; *Conte* v. *Roberts,* 58 R. I. 353, 192 A. 814. It is our belief that petitioner in this case would very likely sustain serious hardship and be greatly aggrieved if her only recourse to obtain review of the trial justice's rulings was by way of appeal after a full trial on the merits. *Cf. Dyer* v. *Keefe,* 97 R. I. 418, 198 A.2d 159. Accordingly, because of the peculiar circumstances presented in this case, we have decided to exercise our discretion and have granted certiorari in order to review the legal question raised by the decision of the trial justice relative to respondents' plea of the statute of limitations.

The Rhode Island general assembly has provided that all civil actions at law for personal injuries shall be brought "* * * within two (2) years next after the cause of action shall accrue and not after." G. L. 1956, §9-1-14. Earlier we have held that this statute prescribes the period of limitation within which medical malpractice suits must be commenced. *Griffin* v. *Woodhead,* 30 R. I. 204, 74 A. 417.

The present controversy revolves around the word *accrued* as it appears in §9-1-14. As counsel for both sides correctly state, the prime issue to be decided on this appeal is at what point in time does a cause of action accrue in medical malpractice cases. In substance, when does the statute of limitations begin to run in such suits, absent concealment or fraud on the part of the medical practitioner. It was conceded by counsel in oral argument that petitioner is not contending there was either fraud or concealment practiced by respondents. Both sides of the issue raised have been exhaustively treated in the written briefs submitted by counsel in the present matter. We wish to note at the outset that what we are deciding on this appeal is merely the law of this jurisdiction relative to the statute of limitations in medical malpractice cases. It is not our intention to decide how the law is to be applied to the facts in the present case. What we are deciding, is whether or

not petitioner's cause survives the preliminary pleas in bar filed herein by respondents.

Initially we address our remarks to the argument of counsel for respondents who contend that the statute of limitations for personal injuries is clear and unambiguous and needs no construction; moreover, they assert that even if it were determined that the statute of limitations was in need of construction in its application to medical malpractice cases, we should refrain from doing so inasmuch as such a decision is pregnant with important policy considerations. They assert that the question should be left for the legislature's determination. We cannot yield to either contention. While this court has passed on §9-1-14 on prior occasions,[1] we have never had before us the question as to how the word *accrued* should be defined. in .the context of this statute when its application is sought in medical malpractice cases. There is a plethora of case law which involves the construction of statutes of limitations strikingly similar to the one in Rhode Island in cases like the one at bar and even the most cursory examination of such authorities unmistakably indicates that few courts indeed would support the contention that the statute is so clear as to warrant no construction thereof. See 80 A.L.R.2d 368, 144 A.L.R. 209, 74 A.L.R. 1317, for an extensive listing of the host of cases on this issue.

In regards to respondents' second contention, we are even less inclined to agree with them. The realities of the legislative process persuade us that courts should not defer questions to the enacting branch of state government merely because the questions may in some form or another re-

---

[1]*Griffin* v. *Woodhead, supra; Kenyon* v. *United Electric Rys.,* 51 R. I. 90, 151 A. 5; *Luft* v. *Factory Mutual Liab. Ins. Co.,* 51 R. I. 452, 155 A. 526; *Luft* v. *Factory Mutual Liab. Ins. Co.,* 53 R. I. 238, 165 A. 776; *Desjourdy* v. *Mesrobian,* 52 R. I. 146, 158 A. 719; *Byron* v. *Great American Indemnity Co.,* 54 R. I. 405, 173 A. 546.

late to public policy. In a narrow view, hardly a case before a court is devoid of some public policy consideration. For courts to adopt the approach suggested by respondents would seriously retard the attainment of justice which, after all, is the true purpose of a court's existence. When presented with issues inextricably entwined with abstruse legalistic concepts and complex principles of law affecting the rights and duties of the public, there can be no doubt that the courts are the most suitable and logical forums for their determination.

The roles of the legislature and the courts are not mutually exclusive of each other, nor should they be regarded as alien to one another. They both perform vital functions in our society and each must perform its function compatibly with the other on problems of mutual concern. If courts were to retreat from deciding issues because the public's interest would be affected thereby, the judicial function in our society would be rendered ineffective. No other institution in our society is better prepared or more ably suited to tackle those issues which combine legal theory and public interest. Indeed we believe a creative judicial role does not conflict with the function of a legislature but rather complements it. See Peck, Cornelius, J., *The Role of the Courts and Legislatures in the Reform of Tort Law*, 48 Minn. L. Rev. 265.

Further it is contended by counsel that since the legislature has specifically made fraudulent concealment an express exception to the statute of limitations in personal injury cases (§9-1-20), a failure to provide for other exceptions should be interpreted as an implicit rejection of all other exceptions. With this argument, we cannot agree. Simply because the legislature has chosen to clarify or define when a cause of action accrues in those instances when fraudulent concealment causes a delay in the bringing of an action for injuries sustained, it does not necessarily follow

that the legislature must therefore have pondered and rejected all other situations which might justify an exception to the statute of limitations for personal injury suits. *Cf. Berry* v. *Branner*, 245 Ore. 307, 421 P.2d 996. Since the statute is silent as to when a cause of action accrues in medical malpractice suits in which the injury suffered does not manifest itself contemporaneously with the negligent conduct of the physician, we believe it is a proper matter for judicial determination. *Fernandi* v. *Strully*, 35 N. J. 434, 173 A.2d 277; *Berry* v. *Branner, supra;* 1 Wood, *Limitation of Actions* (4th ed.), §122 a, pp. 685-86; Walling, Robert H., *Actions-Malpractice-Statute of Limitations*, 18 Ga. Bar Journal 79.

Having disposed of these preliminary considerations, we now focus our attention on the question at hand.

In choosing an event from which the statute of limitations should run in medical malpractice cases where the injury manifested itself some time after the act or conduct alleged to be negligent, we have, theoretically at least, a number of alternatives. It has been held by a number of courts that the statute should be strictly construed so that it bars all claims brought after two years have ended subsequent to the occurrence of the allegedly negligent act. *DeLong* v. *Campbell*, 157 Ohio St. 22, 104 N.E.2d 177. It has also been held that the statute of limitations should be deemed to have begun to run at the point in time when the injury first became apparent. *Silvertooth* v. *Shallenberger*, 49 Ga. App. 133, 174 S.E. 365. Still other courts, in increasing number as of late, have adopted the view that in these cases the statute of limitations should not begin to run until the patient has discovered that he has suffered an injury or, by the exercise of reasonable diligence, should have discovered it. *Johnson* v. *St. Patrick's Hosp.*, 148 Mont. 125, 417 P.2d 469; *Ayers* v. *Morgan*, 397 Pa. 282, 154 A.2d 788. In almost every case dealing with the question it is

recognized that there are valid but contrary interests supporting each of the above views. *Cf. Spath* v. *Morrow,* 174 Neb. 38, 115 N.W.2d 581; *Yoshizaki* v. *Hilo Hospital,* 50 Hawaii 150, 433, P.2d 220.

The respondents advocate that we adhere to the strict construction of the statute of limitations and rule that causes of action in medical malpractice suits "accrue" from the time of the negligent act. This rule, once the clear majority view of those courts which considered the issue, appears to have fallen into some disfavor in more recent times. See *Berry* v. *Branner, supra.* The rule itself is premised on the questionable theory that the discovery of the injury adds nothing to the cause of action which "accrues" at the instant the wrongful act is completed. See *Moore* v. *Juvenal,* 92 Pa. St. 484; see also *Weinstein* v. *Blanchard,* 109 N.J.L. 332, 162 A. 601; *Gardner* v. *Beck,* 195 Iowa 62, 189 N.W. 962; 2 Greenleaf, *Law of Evidence* (16th ed.), §433, p. 409.

In those jurisdictions which have pledged to follow the view of strict interpretation, the courts, recognizing the harshness wrought by its application in medical malpractice cases, have carved out numerous exceptions to the rule, all of which were doubtlessly devised to alleviate the plight of those hapless patients who seemingly were victims of medical mistreatment but who, under the rule, were divested of their remedies before they knew of their rights. Among the most notable exceptions etched in the law by courts in this area is the "continuing treatment" theory first set forth in *Gillette* v. *Tucker,* 67 Ohio St. 106, 65 N.E. 865, which holds that the statute of limitations does not begin to run until after the relationship of physician-patient has

·terminated. Another widely recognized exception, now codified in many jurisdictions including our own,[2] is the tolling of the limitations statute when the court finds fraudulent concealment of the damage. There are some subtle variations which courts have honored in the application of this latter exception.[3]

· In virtually all of the cases in which the court finds fraud, it is generally held that the statute of limitations will not begin to run until the fraud is uncovered or until it is shown that the plaintiff learned or should have learned of the injury. *e.g. Hundley* v. *Martinez,* 151 W.Va. 977, 158 S.E.2d 159. Finally there are a few courts which eschew the strict construction of the statute of limitations in cases in which they find "constructive fraud" on the part of the physician for remaining silent in the face of probable knowledge of the wrong done. See *Burton* v. *Tribble,* 189 Ark. 58, 70 S. W.2d 503.

Thus, as the number of medical malpractice cases have grown, there seems to have developed an almost proportionate increase in the number of exceptions which the courts engrafted on the rule that the statute of limitations runs from the date of the negligent act. Indeed, the sheer rise in number of exceptions to the strict construction rule

---

[2]§9-1-20. Time of accrual of concealed cause of action.—If any person, liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him the existence of the cause of such action, said cause of action shall be deemed to accrue against the person so liable therefor, at the time when the person entitled to sue thereon shall first discover its existence.

[3]A requirement of a showing of scienter of the damage by the physician, see *Hudson* v. *Moore,* 239 Ala. 130, 194 S. 147; *contra, Morrison* v. *Acton,* 68 Ariz. 27, 198 P.2d 590; requiring that the pleadings expressly allege the fraudulent representations or actions by the doctor, compare *Barnard* v. *Thompson,* 138 Tex. 277, 158 S.W.2d 486, with *Carrell* v. *Denton,* 138 Tex. 145, 157 S.W.2d 878, requiring plaintiff to show he exercised due diligence in attempting to discover the cause of action, *Moses* v. *Miller,* 202 Okla. 605, 216 P.2d 979.

has recently induced one state supreme court to remark wryly that the rule had little to recommend it. *Johnson* v. *St. Patrick's Hospital,* 148 Mont. 125, 132, 417 P.2d 469, 473.

The petitioner in the present case urges us to adopt what is commonly referred to in this line of cases as "the discovery rule" which, briefly stated, declares that with reference to medical malpractice suits the statute of limitations does not commence until the plaintiff discovers or, in the exercise of reasonable diligence, should have discovered, that he has sustained an injury as a result of the physician's negligent treatment. Our research indicates that the discovery rule first appeared in the case of *Hahn* v. *Claybrook,* 130 Md. 179, 100 A. 83, but was not seriously considered as a potent legal theory until it was later mentioned by the California supreme court in *Huysman* v. *Kircsh,* 6 Cal.2d 302, 57 P.2d 908. While there is far from unanimity among the courts on the issue with which we are here concerned, we are inclined to think that the trend in this country seems to be moving toward the acceptance of the discovery rule. See *Berry* v. *Branner, supra,* and the extensive list of authorities in support of the discovery rule cited therein; see also Prosser, *The Law of Torts* (3d ed.), §30, p. 148; note, *The Statute Of Limitations In Actions For Undiscovered Malpractice,* 12 Wyo. L.J. 30; note *Malpractice in the Statute of Limitations,* 32 Ind. L.J. 528; 80 A.L.R.2d 368, and cases cited therein.

A proper resolution of this issue, however, requires a thoughtful review of the concept of the statute of limitations and a serious analysis of the conflicting policies advanced in support of each rule. That the statute of limitations plays a vital role in the welfare of our society and in American jurisprudence cannot be gainsaid. As the United States Supreme Court noted long ago in *Wood* v. *Carpenter,* 101 U. S. 135, 139, 25 L.Ed 807, 808, "They

[statutes of limitations] promote repose by giving security and stability to human affairs." Limitations on the time within which actions may be brought are the creation of statutes. Historically, common-law tort actions were recognized, in theory at least, to be perpetual. So long as either party lived, the cause of action could be brought and remedies obtained. See *Developments In The Law, Statutes Of Limitations,* 63 Harv.L.Rev. 1177. When the abuses from stale demands became unendurable, there emerged what may be called the precursor of our modern-day limitation statutes. At first the statutes pertained to realty actions only but later more comprehensive and more commodious limitation acts were drafted. This trend culminated with the passage of the 1623 Limitations Act, 21 James I, which superseded all prior statutes. The statue of James applied to real as well as personal actions and, with some minor exceptions, its provisions are substantially in force or followed in many states of this country, including Rhode Island. See 1 Wood, *Limitation of Actions* (4th ed.), §§2, 3, pp. 4-7; *Kyle* v. *Green Acres at Verona, Inc.,* 44 N. J. 100, 207 A.2d 513; 34 *Am. Jur.,* "Limitation of Actions," §2, p. 14. Today in the United States virtually every action which may be brought is governed by a statute which prescribes the time within which an action must be brought in order for a remedy to be effected thereon.[4]

While in the early times of their existence statutes of limitations were regarded with little favor by courts, the reluctance shown toward their enforcement abated as the salutary purposes of the statutes became apparent. They are founded in the soundest principles of public policy. Their existence stimulates the bringing of actions within the designated time limits when events and circumstances

---

[4]For a comparative analysis of statutes of limitations in a number of states, consult: Littell, A., *Comparison Of The Statutes Of Limitations,* 21 Ind. L.J. 23 (1945).

are still fresh in the minds of the parties and witnesses. *Wood* v. *Carpenter, supra;* 1 Wood, *Limitation of Actions, supra.*

The nature of the statute of limitations, however, and the underlying purpose which it serves are not that which is advanced here by respondents. The defense asserts that the paramount function of the statute of limitations is that it preserves social tranquility and that it should be narrowly construed to better achieve its purpose. We think their argument fails to take proper cognizance of the fundamental concept for which the statutes were designed. It is eminently clear that statutes of limitations were intended to prevent the unexpected enforcement of stale claims concerning which persons interested have been thrown off their guard for want of seasonable prosecution. They are, to be sure, a bane to those who are neglectful or dilatory in the prosecution of their legal rights. 1 Wood, *Limitation of Actions,* §4, p. 8. As a statute of repose, they afford parties needed protection against the necessity of defending claims which, because of their antiquity, would place the defendant at a grave disadvantage. In such cases how resolutely unfair it would be to award one who has willfully or carelessly slept on his legal rights an opportunity to enforce an unfresh claim against a party who is left to shield himself from liability with nothing more than tattered or faded memories, misplaced or discarded records, and missing or deceased witnesses. Indeed, in such circumstances, the quest for truth might elude even the wisest court. The statutes are predicated on the reasonable and fair presumption that valid claims which are of value are not usually left to gather dust or remain dormant for long periods of time. *Riddlesbarger* v. *Hartford Ins. Co.,* 74 U. S. (7 Wall.) 386, 19 L.Ed. 257; 1 Wood, *Limitation of Actions, supra,* §4; *Spath* v. *Morrow, supra.* To those who are unduly tardy in enforcing their known rights, the statute of limitations

operates to extinguish the remedies; in effect, their right ceases to create a legal obligation and in lieu thereof a moral obligation may arise in the aid of which courts will not lend their assistance. *Cf.* 34 *Am. Jur.,* "Limitation of Actions," §11, p. 20.

Our statute of limitations is bottomed on the same theory and policy mentioned above. We cannot subscribe to the contentions of the defense that the statute is at odds with the discovery rule in malpractice cases. On the contrary, we believe the rule is compatible with the statute of repose. It would, in our opinion, be manifestly unjust to bar the enforcement of injury claims brought by a plaintiff who was not, nor could not have known that he was, the victim of tortious conduct because the consequent harm was unknowable within two years of the negligent act. In this age of enlightened medicine and highly sophisticated curative treatment it is very likely that the maturation of injury resulting from negligent treatment would not evidence itself for well after the two years provided for in the statute of limitations. See Estep and Van Dyke Radiation Injuries: *Statute Of Limitations Inadequacies In Tort Cases,* 62 Mich. L. Rev. 753 (1964). This thought becomes particularly disturbing when one realizes that the latent injuries arising from medical malpractice would very likely go undetected by the victim, as only trained and skillful practitioners of medicine could ascertain whether a patient has been mistreated. Even the physical symptoms which might herald future inquiry may well be beyond the comprehension or perception of the average layman.

We are also not unmindful of the conflicting policies which the issue before us raises between doctors and the general public. It is customarily advanced in these cases that doctors are unjustly prejudiced by the discovery rule as its application sanctions stale law suits in which the medical practitioner is hard pressed to defend because of

faded recollections, perishable evidence and imperfect records. Of course, the countervailing policy argument, which also has merit, is that the public should be protected against medical mistreatment which does not become ascertainable until after the statutory period runs. These antipodal arguments seem to be fairly resolved in favor of the public. It would appear from the modern trend towards the application of the discovery rule, that courts are beginning to conclude that only the negligent physician is protected by the strict interpretation of the statute of limitations in malpractice cases at the cruel expense of the public and of the competent physician. *Cf.* Note *The Statute Of Limitations In Actions For Undiscovered Malpractice,* 12 Wyo. L. J. 30, for an illuminating discussion on this point. As the supreme court of New Jersey recently noted, "If, as is to be hoped, the resulting jeopardy to defendants produces a greater measure of care in connection with surgical operations, so much the better." *Fernandi* v. *Strully, supra,* 35 N. J. 434, 451, 173 A.2d 277, 286.

Hence, it is our firm belief that the discovery rule in medical malpractice cases is preferable to the adoption of the strict construction of the statute of limitations. When §9-1-14, the statute of limitations for personal injury, is viewed with due allegiance being given to its intended purposes, the adoption of the discovery rule is virtually ineluctable. To construe the statute narrowly so as to preclude a person from obtaining a remedy simply because the wrong of which he was the victim did not manifest itself for at least two years from the time of the negligent conduct, is clearly inconsistent with the concept of fundamental justice. To require a man to seek a remedy before he knows of his rights, is palpably unjust. Under such circumstances, in order for a patient to secure and protect his legal rights against doctors for malpractice, the patient would be required to submit himself to complete examinations by a

series of independent physicians after every operation or treatment he received from the physician of his first choice. The unreasonableness of such a result is self-evident. No statute should be construed to bring about a patently inane result; moreover, we have often said the legislature could never be presumed to have intended to enact laws which are absurd, unjust or unreasonable. *State* v. *Haggerty*, 89 R. I. 158, 151 A.2d 382. Accordingly, we prefer to follow the discovery rule in medical malpractice cases because in our opinion the theory behind it is eminently fair and perfectly consistent with the function and nature of limitation acts.[5]

Finally we wish to respond to the respondents' argument that the discovery rule should be limited to medical malpractice cases in which doctors negligently fail to remove a foreign object after an operation. We specifically reject such an idea for the reasons which are apparent from our discussion of the issue in the foregoing paragraphs.

Thus the present petitioner should have her day in court to show, if she can, that her suit was timely brought and that she is entitled to relief. Whether or not she will prevail must await a hearing on the merits in the superior court.

The petition for certiorari is granted, the decision of the superior court sustaining the respondents' demurrers to the petitioner's replications in all cases is quashed, and the records certified to this court are ordered returned to the superior court with our decision endorsed thereon.

---

[5]In passing, it is to be noted that the elemental precepts of the discovery rule have been recognized by this court and applied in workmen's compensation cases. Consult *Rosa* v. *George A. Fuller Co.*, 74 R. I. 215, 60 A.2d 150. The result in *Rosa* was implicitly approved by the legislature when it amended §28-35-57 which prescribes limitation periods for workmen's compensation cases to incorporate the view expressed in *Fuller*.

240

[BLACK BAR]

*Aisenberg, Decof & Dworkin, Leonard Decof, John H. Hines, Jr.,* for petitioners.

*Gunning & LaFazia, Edward L. Gnys, Jr.* and *V. James Santaniello* for John M. Vesey and Russell R. Hunt, *Hinckley, Allen, Salisbury & Parsons, Thomas D. Gidley* for Peter F. Harrington, for respondents.