**Joseph ZUCCOLO et al.**

v.

**Andrew S. BLAZAR, M.D. et al.**

**No. 95–657–Appeal.**

Supreme Court of Rhode Island.

June 6, 1997.

Susan Carlin, Stephen R. Famiglietti, Vincent F. Rogosta, Jr., Providence, for Plaintiff.

John T. Walsh, Kelly R. Sheridan, Robert P. Landau, Providence, for Defendant.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER, and FLANDERS, JJ.

**OPINION**

PER CURIAM.

This matter came before the Supreme Court for oral argument on March 5, 1997, pursuant to an order that directed the plaintiffs to appear and show cause why the issues raised by the plaintiffs' appeal from the final judgment entered on the defendants' motion for summary judgment in the Superior Court should not be summarily decided.

After hearing the arguments of counsel and considering the memoranda submitted by the parties, we are of the opinion that cause has not been shown. The issues raised in the appeal will be decided at this time.

Joseph Zuccolo (Joseph) and his wife, Karen Zuccolo (Karen), were having difficulty conceiving a child. As a result, in October 1983, they sought medical advice and treatment from the defendant OB–GYN Associ-

ates, and the doctors employed there, Andrew S. Blazar, M.D. (Blazar), and Harris Galkin, M.D. (Galkin), also named defendants. In conjunction with Joseph's treatment, Blazar and Galkin prescribed a steroid called Medrol that is generally prescribed to lower antisperm antibodies. Although the defendants, in response to Joseph's inquiries, told him that there would be side effects from the ingestion of the Medrol, they did not tell him that one of the possible side effects could be avascular necrosis (also known as osteonecrosis), a disease of the joints.

In April 1985 Joseph began taking the Medrol. After several months of taking the medication, Joseph began experiencing swelling in his joints. As a precautionary measure, Joseph's general practitioner suggested that Joseph stop taking the Medrol. However, the general practitioner never specifically diagnosed avascular necrosis as being the cause of the swelling. Joseph stopped taking the Medrol as suggested, but his joint swelling problems continued. Joseph thereafter, from late 1985 through 1988, contacted three different rheumatologists, one in Providence, one at Brigham and Women's Hospital in Boston, Massachusetts, and one at the Lahey Clinic in Burlington, Massachusetts, in hopes of learning the cause of his joint swelling problems. Although Joseph told all three doctors that he thought his problems were related to the Medrol, all three diagnosed him as having rheumatoid arthritis, which has no known connection to steroid use.[1]

In December 1988 a rheumatologist at the Lahey Clinic, William P. Beetham, Jr., M.D. (Beetham), conducted an MRI scan of Joseph's hips. That scan revealed for the first time that Joseph was suffering from avascular necrosis of the hips, not just rheumatoid arthritis as previously diagnosed. In a letter dated January 17, 1989, Beetham ambiguously suggested that the avascular necrosis "can be secondary to your [Joseph's] rheumatoid arthritis or even related to previous medication." Beetham did not specifically mention Joseph's use of Medrol as a possible cause of the avascular necrosis. However,

although there is no known connection between rheumatoid arthritis and the use of steroids, a connection between avascular necrosis and the use of steroids like Medrol has been documented in the medical literature. *See* Philip N. Sambrook, John Hassall & John R. York, *Osteonecrosis After High Dosage, Short Term Corticosteroid Therapy*, 11 J. Rheumatology 514–16 (1984).

On July 31, 1991, Joseph and Karen filed a complaint in Providence County Superior Court, alleging medical malpractice. The defendants moved for summary judgment because although Joseph first began taking the Medrol in 1985 and first experienced the swelling in his joints within several months thereafter, he did not file his complaint until six years later, well beyond the three year limitation period set forth in G.L.1956 § 9–1–14.1. The plaintiffs asserted in response to the summary judgment motion, however, that the discovery rule set forth in § 9–1–14.1(b) permitted them to file their complaint in July 1991 because the earliest Joseph could have, with reasonable diligence, discovered that his injuries were caused by his use of Medrol was December 14, 1988, when the MRI scan was conducted at the Lahey Clinic. That discovery of injury was within three years of the filing date of the medical malpractice complaint. The trial justice rejected plaintiffs' contention and entered summary judgment in favor of the defendants.

Section 9–1–14.1 provides:

"Notwithstanding the provisions of § 9–1–14 [setting forth a three year statute of limitation for personal injury actions], an action for medical malpractice shall be commenced within three (3) years from the time of the occurrence of the incident which gave rise to the action; Providing, however, that:

\* \* \* \* \* \*

(b) In respect to those injuries due to the acts of medical malpractice which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within

---

1. In fact, steroids are often used to treat rheumatoid arthritis. *See The Merck Manual of Diagno-* *sis and Therapy* 1245 (Berkow & Fletcher 15th ed. 1987).

three (3) years of the time that the act or acts of medical malpractice should, in the exercise of reasonable diligence, have been discovered."

In *Renaud v. Sigma–Aldrich Corp.*, 662 A.2d 711 (R.I.1995), we considered whether the discovery rule was applicable in a situation in which a plaintiff had immediate knowledge of her exposure to dangerous fumes. In holding that it was not applicable because of the plaintiff's immediate knowledge of the harm done to her, we distinguished our prior holdings in *Anthony v. Abbott Laboratories,* 490 A.2d 43 (R.I.1985); *Lee v. Morin,* 469 A.2d 358 (R.I.1983), and *Wilkinson v. Harrington,* 104 R.I. 224, 243 A.2d 745 (1968). In all those cases we had concluded "that a statute of limitations will not begin to run until an injury or some wrongful conduct should have, in the exercise of reasonable diligence, been discovered." *Renaud,* 662 A.2d at 714–15. Specifically, in *Wilkinson,* we explained that "[t]o require a man [or a woman] to seek a remedy before he [or she] knows of his [or her] rights, is palpably unjust." *Wilkinson,* 104 R.I. at 238, 243 A.2d at 753.

In *Anthony,* we were confronted with a situation in which a plaintiff ingested a drug but did not manifest any adverse effects from the drug until many years later. Although that case arose in the context of a drug product-liability action and not a medical malpractice action as here, the analysis is equally applicable to the facts before us where the plaintiff also ingested a drug but did not manifest adverse effects therefrom until several months later. We explained in *Anthony* that "where the manifestation of an injury, the cause of that injury, and the person's knowledge of the wrongdoing * * * occur at different points in time, the running of the statute of limitations would begin when the person discovers, or with reasonable diligence should have discovered, the *wrongful conduct* * * *." *Anthony,* 490 A.2d at 46. (Emphasis added.) The manifestation of Joseph's injury, the cause of that injury, and the knowledge of the wrongdoing certainly occurred at different points in time, and Joseph, acting as he did with reasonable diligence, should not have been barred from bringing his action when he did.

As soon as Joseph began experiencing problems with his joints, he went to see his general practitioner. The general practitioner suggested that Joseph stop taking the Medrol as a precautionary measure, but no specific connection between the Medrol and the joint problems was ever made. Nonetheless, still suspecting some connection, Joseph sought out the advice of three different rheumatologists, all of whom initially diagnosed Joseph with rheumatoid arthritis. Finally, in a last attempt to diagnose the problem conclusively, the fourth doctor Joseph visited, Beetham, conducted an MRI scan. The results therefrom were the first indication to Joseph of any connection between his use of Medrol and his joint problems. Before that time, Joseph had only suspected a connection, but that suspicion had never been confirmed by, and in fact had been explicitly contradicted by, the diagnoses given by the numerous experts retained by Joseph. Nevertheless, although four different doctors did not make a connection between the Medrol and Joseph's medical problems, Joseph was not deterred and still kept searching for a confirmation of his suspicions. Joseph's diligence and persistence were rewarded when the results of his MRI scan came back and finally indicated a possible connection between the Medrol and his joint problems. We cannot conceive of a set of facts that would more clearly demonstrate the concept of reasonable diligence as set forth in § 9–1–14.1(b). Accordingly, since Joseph filed his complaint within three years of the December 1988 MRI scan that first alerted Joseph to the alleged wrongful conduct of the defendants, his action was not barred by the statute of limitations.

For the foregoing reasons, the appeal is hereby sustained, the final judgment below is vacated, and the papers in this cases are remanded to the Superior Court for further proceedings in accordance with this opinion.

GOLDBERG, J., did not participate.