Virginia HANSON et al.

v.

Edwin SINGSEN, M.D.

No. 204–301–Appeal.

Supreme Court of Rhode Island.

June 12, 2006.

R. Park Palmer, Jr., for Plaintiffs.

Robert P. Landau, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

Virginia Hanson (Hanson) and her husband, Francis Hanson (collectively plaintiffs), appeal from a judgment in the Superior Court granting a motion for judgment as a matter of law in favor of Edwin Singsen, M.D. (Dr. Singsen or defendant),[1] on the grounds that the plaintiffs failed to prove proximate causation in their medical malpractice claim, that the plaintiffs failed to prove their informed consent claim, and that the statute of limitations barred the plaintiffs' claims. For the reasons discussed herein, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On February 2, 1990, Hanson tore her anterior cruciate ligament (ACL) when she slipped on a clam shell while working as a federal police officer on the United States Naval Base in Newport. She sought medical treatment for her injuries from defendant. On December 23, 1998, Hanson filed a tort claim for medical malpractice against defendant. The events of the eight intervening years were recounted at a jury trial in 2004.[2]

---

1. Newport Hospital was dismissed as a defendant by stipulation of the parties prior to trial.

2. The majority of the facts in this section come from the trial testimony of Hanson. While defendant's presentation of facts is understandably at odds with plaintiffs' on cer-

Hanson testified that she first met with Dr. Singsen in February 1990, shortly after her accident. He examined her knee, said she had probably damaged her ACL, and told her that she was a good candidate for ACL reconstruction surgery because she was physically fit and healthy. Doctor Singsen performed the ACL reconstruction surgery on March 2, 1990, at Newport Hospital. During the surgery, Dr. Singsen implanted a Dacron graft, known as a Kennedy Ligament Augmentation Device, in Hanson's knee.[3] After the surgery, Hanson continued to experience great pain and swelling, as well as inhibited movement, and repeatedly sought Dr. Singsen's assistance with this pain. During this period, Hanson regularly attended physical therapy sessions, which caused her extreme pain. On July 6, 1990, Hanson met with Dr. Singsen to discuss the possibility of his performing a manipulation[4] on her leg to improve its condition.

Hanson testified that Dr. Singsen did not discuss with her the risks of this procedure, although she did sign a consent form that contained both her signature and a list of risks associated with the manipulation procedure. According to Hanson, Dr. Singsen told her that he planned to clear the adhesions and scar tissue produced from the first operation. After the manipulation, however, Hanson continued to experience serious pain and lose more range of motion. She testified that Dr. Singsen refused to perform X-rays. Doctor Singsen told Hanson he was going to stop the physical therapy because she had reached a "plateau." When she asked him what to do about the pain, he told her that

the pain was in her head. At that point, Hanson discontinued treatment with Dr. Singsen. Hanson said that at the time she did not suspect that Dr. Singsen had done anything wrong when performing her surgery, but that she discontinued his treatment because she felt humiliated by the way he had spoken to her in his office.

Hanson testified that the next day she made an appointment with her former doctor, Dr. Elie Cohen (Dr. Cohen), to ask for help alleviating the pain. Directly after this visit, Hanson tried to make an appointment to see a sports specialist in Boston. When she returned home from the visit, she began what would become a years-long process: attempting to secure permission from the United States Department of Labor, Office of Workers' Compensation Programs (OWC), to see a specialist. She left the OWC one message, then, when no one returned her call, she called again a few days later and explained the situation. The OWC told her that it would get back to her.

Hanson testified that by June 1991, her pain, swelling and imbalance had increased to the point that she could no longer work at all. Doctor Cohen wrote an initial letter to the OWC on her behalf explaining that she was not capable of working even "light duty." In another letter dated September 9, 1993, Dr. Cohen stated that Hanson "should have an arthoscope and [magnetic resonance imaging] in order to determine if there is any impingement or abnormal tissue or reaction in her knee." Permission was not forthcoming.

tain points, we treat it only briefly due to our review of all the facts in the light most favorable to the nonmoving party—here, plaintiffs.

**3.** ACL reconstruction surgery procedures vary. In the "over the top" type chosen by Dr. Singsen, a Dacron graft is placed so that

it runs toward the outside of the knee to replicate the anatomy.

**4.** In a manipulation, the patient is put under anesthesia while the doctor physically moves the knee through a full range of motion.

At the same time, Hanson continued writing letters to the OWC requesting permission and funding to seek a second medical opinion. The OWC eventually called Hanson. Over defendant's motion to strike, Hanson was permitted to testify that she made several different telephone calls to the OWC to find out why it would not grant her requests. She said she was told that she could not see another doctor without the OWC's permission, or she would lose all her benefits. Doctor Cohen continued to write letters to the OWC requesting this permission; she did not seek or obtain care from any other doctors.

In 1994, the OWC sent Hanson to Dr. Louis Meeks (Dr. Meeks). Hanson originally equated this with permission to see a specialist, but upon meeting with Dr. Meeks, discovered that he was only to evaluate Hanson to determine whether she could return to work. When Hanson realized that Dr. Meeks had no questions for her regarding her history or her pain, she left. The OWC warned Hanson to comply with its requirements to see particular doctors. Later that same year, the OWC sent Hanson to another doctor, who again evaluated Hanson regarding her possible return to work, and recommended in his report that she see a specialist for a second opinion. In 1995, the OWC sent Hanson to yet another doctor, who yet again evaluated her for the purposes of determining her fitness for work, and who approved her for light duty in a sedentary position. Despite continuing pain and limited mobility, Hanson continued to await permission from the OWC to see a specialist.

In December 1995, Hanson finally received permission from the OWC to see a specialist, Dr. William Mitchell (Dr. Mitchell). Doctor Mitchell ordered X-rays and a magnetic resonance imaging (MRI), and also performed an arthroscopy of Hanson's knee. Doctor Mitchell's reports indicate, as he told Hanson at the time, that the MRI revealed that Dr. Singsen had misplaced the graft during the ACL reconstruction surgery. In addition, the arthroscopy revealed that as a result of the extreme force used in the manipulation—necessary because the misplaced graft made movement of the knee more difficult—a piece of bone had broken off and scar tissue had grown over and around it, exacerbating Hanson's knee pain and further immobilizing her knee.

Doctor Mitchell's diagnosis was a failed ACL surgery. Doctor Mitchell performed a second knee surgery on Hanson, in which he excised the graft and removed it completely from her knee, along with the piece of bone that had detached during the manipulation. Hanson testified that this second surgery greatly reduced her pain and that she regained some motion. Doctor Robert Dunn (Dr. Dunn), an expert witness who reviewed Dr. Mitchell's reports, testified for plaintiffs that if Dr. Singsen had complied with the standard of care when he performed the original ACL surgery, Hanson would not have needed the subsequent surgery.

At the close of testimony, pursuant to Rule 50 of the Superior Court Rules of Civil Procedure, defendant made a motion for judgment as a matter of law on the following grounds: (1) The plaintiffs failed to prove causation and damages; (2) plaintiffs failed to prove their informed consent claim; (3) Hanson assumed the risk and exacerbated any surgical deficiencies by not following through with physical therapy and by delaying the performance of the manipulation; and (4) the statute of limitations barred recovery, since the discovery rule did not apply in this case of non-latent injury. The trial justice granted defendant's motion with respect to the first,

second, and fourth grounds, and she declined to address the third ground. The plaintiffs now appeal.

## II

### Analysis

On appeal, plaintiffs assert that the trial justice committed three instances of reversible error when she granted defendant's motion for judgment as a matter of law on the first, second, and fourth grounds above.

■ "When reviewing a trial justice's decision on a motion for judgment as a matter of law, 'this Court is bound by the same rules and standards as the trial justice.'" *Tedesco v. Connors*, 871 A.2d 920, 927 (R.I.2005) (quoting *Mills v. State Sales, Inc.*, 824 A.2d 461, 472 (R.I.2003)). A trial justice may grant such a motion only after "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue * * *." Super. R. Civ. P. 50(a)(1). We will reverse a trial justice's issuance of judgment as a matter of law where the trial justice has "invaded the province of the jury by impermissibly finding facts." *Martino v. Leary*, 739 A.2d 1181, 1183 (R.I.1999).

■ The plaintiffs assert that the trial justice erred when she found as a matter of law that the statute of limitations served to bar plaintiffs' claim. "The application of the statute of limitations is a matter of law for the trial justice to determine." *Ashey v. Kupchan*, 618 A.2d 1268, 1270 (R.I. 1993). The statute of limitations for a claim of this type is provided by G.L.1956 § 9–1–14.1, which reads, in pertinent part:

"[A]n action for medical * * * malpractice shall be commenced within three (3) years from the time of the occurrence of the incident which gave rise to the action; provided, however, that:

"* * *

"(2) In respect to those injuries or damages due to acts of medical * * * malpractice which *could not in the exercise of reasonable diligence be discoverable at the time of the occurrence* of the incident which gave rise to the action, suit shall be commenced within three (3) years of the time that the act or acts of the malpractice *should, in the exercise of reasonable diligence, have been discovered.*" (Emphases added.)

The plaintiffs and defendant argue for two different interpretations of this statute. The plaintiffs contend that this Court has held that reasonable diligence may occur when an injured party is aware of pain, but not aware of a defendant's role in the injury; in this reading, an injured party could then bring suit against the tortfeasor within three years after discovering that the tortfeasor was at fault. The defendant contends that this Court has, in fact, never adopted such a broad interpretation, but rather has held injured parties in those situations to the reasonable diligence standard in discovering the injury itself.

The plaintiffs argue on appeal that this Court should apply the rule articulated in *Anthony v. Abbott Laboratories*, 490 A.2d 43 (R.I.1985), and hold that when the injury is discovered before the fault of the tortfeasor is discovered, the statute of limitations is tolled until the fault of the tortfeasor is discovered. We said in *Anthony:*

"[I]n a *drug product-liability action* where the manifestation of an injury, the cause of that injury, and the person's knowledge of the wrongdoing by the manufacturer occur at different points in time, the running of the statute of limitations would begin when the person discovers, or with reasonable diligence should have discovered, the wrongful

conduct of the manufacturer." *Id.* at 46 (emphasis added).

This case expanded our discovery rule in one very specific circumstance—prescription drug product-liability suits. *See also Zuccolo v. Blazar,* 694 A.2d 717, 719 (R.I. 1997) (applying the *Anthony* analysis to a medical malpractice claim also regarding the side effects of a prescription drug). *Anthony* and *Zuccolo* contemplate cases wherein the act—the ingestion of a prescription drug—may be highly attenuated from the eventual injury. We did *not* extend the particularized prescription drug test to other claims of medical negligence.

▇ Because this case does not involve prescription drugs, we apply the traditional rule: "[T]he discovery date is the date that the plaintiffs knew or should have known of the 'wrongful act' that is the basis of their lawsuit." *Ashey,* 618 A.2d at 1269. We have long made exception for an undiscoverable act of medical negligence: In *Wilkinson v. Harrington,* 104 R.I. 224, 237, 243 A.2d 745, 752 (1968), we held that the discovery rule applied to a medical malpractice case in which an injury remained latent for years, undiscoverable by the victim. *See also Martin v. Howard,* 784 A.2d 291, 300 (R.I.2001) (discussing the traditional rule as articulated in *Wilkinson* and the *Anthony* rule). "An injury is latent and potentially undiscoverable when, exercising 'reasonable diligence' at the time of the injury, is unable to discover the wrongful act, neglect or default." *O'Sullivan v. Rhode Island Hospital,* 874 A.2d 179, 185 (R.I.2005) (quoting G.L.1956 § 10–7–2).[5] "If a reasonable person in similar circumstances should have discovered that the wrongful conduct of the defendant caused her injuries as of some date before the plaintiff alleged that

she made this discovery, then the earlier date will be used to start the running of the limitations period." *Martin,* 784 A.2d at 300; *see also Anthony,* 490 A.2d at 48.

Our inquiry, then, turns on when Hanson should have known of the wrongful act—here, the failed knee surgery. The plaintiffs argue that the statute of limitations was tolled until Hanson's appointment with Dr. Mitchell, in which an arthroscopy revealed the misplaced graft. In *Ashey,* we affirmed the finding of a trial justice that "the date that plaintiffs tracked down an expert to confirm their suspicions of negligence is not the operative discovery date." *Ashey,* 618 A.2d at 1269. *But see O'Sullivan,* 874 A.2d at 188 (a plaintiff "not obliged to beat the bushes at the first conceivable opportunity" to attribute fault to "yet more possible tortfeasors"). If we determine that Hanson *should have known* of the negligence at a date earlier than her appointment with the specialist, then the applicable three-year statute of limitations will bar the claim she filed in December 1998. In other words, an *undiscovered* act of negligence is not necessarily an *undiscoverable* act of negligence for the purposes of tolling the statute of limitations.

▇ The plaintiffs argue on appeal that Hanson's efforts to persuade the OWC to permit her to see a specialist constituted due diligence. Hanson's testimony at trial indicated that she was in contact with the OWC between 1991 and 1995. She repeatedly requested permission to see a specialist; Dr. Cohen advised the OWC that Hanson should have an MRI and an arthroscopy. Over defendant's motion to strike, Hanson was permitted at trial to testify that the OWC officials instructed

---

**5.** We recognize the fact that our decision in *O'Sullivan v. Rhode Island Hospital,* 874 A.2d 179, 185 (R.I.2005), was limited to the Wrongful Death Act, but some of its definitional and procedural discussion is more broadly relevant.

her not to consult a specialist without their permission—at the risk of losing all of her OWC benefits if she visited an outside doctor before OWC permission arrived. Hanson said that this was the reason she delayed procuring a second opinion. In effect, plaintiffs ask us to hold that a reasonable person receiving OWC benefits would have allowed nearly five years to pass before seeing a specialist, even after she was told that she needed an MRI and an arthroscopy. We disagree. Our discovery rule does not protect a plaintiff who, as in this case, allows five years to pass between a knee surgery and an arthroscopy of that knee to discover why the entire interim period had been characterized by pain and immobility. Hanson's fear of losing her benefits is understandable; however, it is simply not reasonable for a person suffering a great deal of pain and immobility not to try to see a specialist regardless of the OWC's consent. Extending the statute of limitations in this case would prejudice defendant.

Although Hanson may not have known of the specific graft misplacement, we hold that a reasonable person *should have known* of the negligence at an earlier date.

It is sufficient to note that the statute of limitations in this case began running at the time a patient who had undergone a non-negligent ACL surgery would have stopped feeling pain. The misplaced graft, while itself undiscovered, was not undiscoverable. Therefore, we hold that the trial justice did not err when she found that the statute of limitations barred plaintiffs' claim, because the discovery rule did not toll the statute of limitations.

Having determined that the plaintiffs' claim was time-barred, we need not reach the two substantive issues in the plaintiffs' appeal: causation and informed consent.

### Conclusion

For the reasons discussed above, we affirm the judgment of the Superior Court. The record shall be returned to the Superior Court.