# United States Court of Appeals
## For the First Circuit

No. 11-2332

RARED MANCHESTER NH, LLC,

Plaintiff, Appellant,

v.

RITE AID OF NEW HAMPSHIRE, INC.; RITE AID CORPORATION,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Boudin, Selya and Dyk,*
Circuit Judges.

Alton Colwell Stevens, with whom Marden, Dubord, Bernier & Stevens was on brief, for appellant.
John A. Hobson, with whom Perkins Thompson, P.A. was on brief, for appellees.

August 29, 2012

_____

*Of the Federal Circuit, sitting by designation.

**SELYA**, <u>Circuit Judge</u>.  There are no role models in the tale that we chronicle here.  The story line pits a sophisticated developer against a sophisticated tenant.  The parties had done business for many years and (at least in the developer's view) had established a template for future transactions.  Their current dispute arose when the tenant forwarded to the developer a commercial lease containing a material term that deviated from the parties' previous leases, without specifically drawing the developer's attention to the change.  The developer says that it did not read the proffered lease "line by line," but nevertheless signed it.  When the developer, years later, discovered the new term, it protested.  Outrage soon morphed into litigation.  The district court, without passing upon the merits of the dispute, entered summary judgment against the developer on the ground that the action was time-barred.  After careful consideration, we affirm.

## I.  BACKGROUND

We rehearse the facts in the light most favorable to the summary judgment loser, consistent with record support.

Stephen Dubord is both a developer and an attorney.  His principal development entity is Rared Company, Inc.  Plaintiff-appellant Rared Manchester NH, LLC is an entity created by Dubord for the single purpose of leasing the store involved in this

litigation.  For ease in exposition, we refer to Rared Company and Rared Manchester NH, LLC collectively as Rared or the lessor.

Defendants-appellees Rite Aid Corporation and its wholly owned subsidiary, Rite Aid of New Hampshire, Inc. (collectively, Rite Aid or the lessee) operate a large number of drug stores, several of which are leased from Rared.  By early 1996, Rite Aid had executed leases for five stores built by Rared.[1]

Throughout this course of dealing, Dubord (who is also the sole member of each single-purpose entity) represented the lessor and Attorney Alan Garubba represented the lessee.  Dubord testified at his deposition that he "[thought] it was the general understanding" that these early leases would serve as a template for the parties' future lease transactions.  According to Rared's statement of material facts, see D. Me. R. 56(c), only site-specific terms were to be changed; and the parties, in their subsequent course of dealings, always discussed substantive changes.

On April 2, 1996, the parties entered into their sixth lease, which was for a store in Manchester, New Hampshire.  Under Article 26 of the lease, the base rent for the premises was set at $206,047.40 per year, payable in twelve equal monthly installments. The lease further contained a percentage rent clause calling for

---

[1] The leases were signed by Rared Company, Inc.  Each has since been assigned to its own single-purpose entity.

-3-

Rite Aid to report the store's annual adjusted gross revenue, which was to be calculated by subtracting certain contractually defined categories of sales (e.g., the proceeds of sales of cigarettes and alcoholic beverages) from gross revenue. If 2.5% of adjusted gross revenue exceeded the base rent amount in any lease year, Rite Aid was obligated to pay the difference to Rared as additional rent. The net effect was that Rite Aid would owe as yearly rent either the base figure or 2.5% of adjusted gross revenue, whichever was greater.

In these respects, the lease was nearly identical to the five previous leases executed by and between the parties. The Manchester lease differed, however, in that Article 26(g) exempted from the calculation of adjusted gross revenue "sales of prescription drugs reimbursed by third party payors." This exclusion was significant because prescription drug sales account for over half of gross sales at a typical Rite Aid store and, given this mix of business, the exclusion made it unlikely that the percentage rent clause would ever be triggered at the Manchester premises.

Negotiations for the Manchester lease began in February of 1996, when Garubba mailed Dubord an initial draft of a proposed lease containing the prescription exclusion.[2] On March 11, 1996,

_____

[2] For the first time on appeal, Rared says that it cannot be sure whether the original draft contained the critical language or whether it was inserted later in the negotiations. This suggestion

-4-

Dubord responded in a letter that requested certain substantive changes (but did not mention the percentage rent clause). At the end of this letter, he stated that "[he] ha[d] not read the lease line by line yet, but based on the assumption that it [wa]s identical to [Rared's] other leases in all material respects," he was ready to sign a revised draft. Rite Aid accommodated the changes requested in the letter but did not reply in any way to the sentence mentioning Dubord's assumption. Instead, Garubba sent execution copies of a proposed final draft to Dubord, who signed and returned them. The lease that Dubord signed contained the undiscussed prescription exclusion.

In 2005, an unrelated incident at the Manchester store attracted Dubord's attention. He learned from a manager that the store, and in particular its pharmacy, had been exceedingly busy. Dubord investigated further and noticed the prescription exclusion in the lease. He then worked the numbers and realized that, but for the prescription exclusion, Rite Aid would have owed amounts in excess of the base rent starting in 2004.

Dubord protested to Rite Aid and the parties attempted to reach an amicable resolution of the lessor's claim that the prescription exclusion had no place in the lease. To that end, the parties executed a series of tolling agreements beginning on August

---

was not advanced below and, thus, any argument based upon it is deemed abandoned. See Sandstrom v. ChemLawn Corp., 904 F.2d 83, 87 (1st Cir. 1990).

2, 2007.  When they failed to reach common ground, Rared invoked diversity jurisdiction, see 28 U.S.C. § 1332(a)(1), and sued Rite Aid in Maine's federal district court on May 28, 2010.

Pertinently, the complaint contained counts for breach of fiduciary duty and misrepresentation (essentially, a claim that the lessor had been fraudulently induced into entering the lease by the lessee's failure to respond to Dubord's mistaken assumption).[3] Following pre-trial discovery, Rite Aid moved for summary judgment on the ground that Maine's six-year statute of limitations for tort actions, see Me. Rev. Stat. Ann. tit. 14, § 752, foreclosed the suit.  Rared opposed the motion.  The district court referred the matter to a magistrate judge, see 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b), who recommended that the court grant the motion. See Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., No. 2:10-cv-00203, 2011 WL 4005304, at *1 (D. Me. Sept. 6, 2011).  On de novo review, the district court adopted the magistrate judge's recommendation wholesale and entered judgment accordingly.  See Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., No. 2:10-cv-203, 2011 WL 4900003 (D. Me. Oct. 14, 2011).  This timely appeal ensued.

---

[3] The complaint initially contained yet another count for mutual mistake.  The district court jettisoned this count and Rared has not pursued its claim of mutual mistake in this appeal.

-6-

## II.  ANALYSIS

We review a district court's entry of summary judgment de novo, taking the facts and all reasonable inferences therefrom in the light most hospitable to the nonmoving party.  Certain Interested Underwriters at Lloyd's, London v. Stolberg, 680 F.3d 61, 65 (1st Cir. 2012).  "We will affirm only if the record reveals 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Avery v. Hughes, 661 F.3d 690, 693 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  "This standard of review permits us to embrace or reject the rationale employed by the lower court and still uphold its order for summary judgment.  In other words, we may affirm such an order on any ground revealed by the record."  Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

The parties agree that Maine law provides the substantive rules of decision.  See Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938).  The lease was executed in Maine, and we are free to accept this plausible agreement.  See, e.g., Katz v. Pershing, LLC, 672 F.3d 64, 72 (1st Cir. 2012); Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991).

Rared has cast its remaining claims as tort claims.  Maine has a six-year statute of limitations for tort actions.  Me. Rev. Stat. Ann. tit. 14, § 752.  The Manchester lease was executed on April 2, 1996.  If the lessor's cause of action accrued on that

date, then the time for filing suit expired in April of 2002. Inasmuch as the parties did not execute the first tolling agreement until 2007, Rared's suit would be late by more than eight years.

The lessor contests the accrual date. Its principal argument is that its cause of action did not accrue until 2004 (the first lease year for which Rite Aid, under the original formula, would have owed percentage rent). But the notion upon which this argument rests — that the lessor suffered no injury until the first year for which percentage rent would have been due — confuses the injury for which the lessor sues with the damages that the lessor seeks.

To be sure, "[t]here is generally no cause of action in tort until a plaintiff has suffered an identifiable, compensable injury." Bernier v. Raymark Indus., Inc., 516 A.2d 534, 542 (Me. 1986). Injury, however, is not always synonymous with money damages. Under Maine law, a party is injured when its legal rights have been violated, even if nominal damages or equitable remedies are the only forms of recourse available to it at that time. See Bozzuto v. Ouellette, 408 A.2d 697, 699 (Me. 1997). It follows that "a cause of action sounding in tort accrues when the plaintiff sustains harm to a protected interest." Chiapetta v. Clark Assocs., 521 A.2d 697, 699 (Me. 1987).

Here, harm to the lessor occurred at the time that Rared executed the lease indenture. The lease contained the undiscussed

-8-

prescription exclusion, and Rared could at that moment have sued on the same grounds on which it now relies.

Of course, the lessor would not have been entitled to recompense for pecuniary damages not then incurred. It nonetheless could have sought other redress at any time after the lease was signed, including nominal damages, reformation of the contract, or a declaratory judgment. No more is exigible to start the running of the limitations period. See Johnston v. Dow & Coulombe, Inc., 686 A.2d 1064, 1066 (Me. 1996); see also Williams v. Ford Motor Co., 342 A.2d 712, 715 (Me. 1975) ("'[I]n every case of violation of the rights of a particular individual, the law implies damage. It may be but nominal. But still a right of action accrues for it.'" (alteration in original) (quoting Betts v. Norris, 21 Me. 314, 319 (1842))).

The lessor strives to undermine the compelling conclusion that the date of execution of the lease is the accrual date for its tort claims. To this end, it cites Bernier for the proposition that the date of accrual is the date on which an injury manifests itself. Bernier, however, is inapposite; that case turned on Maine's common-law discovery rule, which in narrowly defined circumstances sets the date of accrual as the time "when the injury is discovered rather than when the injury was incurred." McLaughlin v. Superintending Sch. Comm. of Lincolnville, 832 A.2d 782, 788 (Me. 2003).

The common-law discovery rule is separate and distinct from the statutory tolling provision, see Me. Rev. Stat. Ann. tit. 14, § 859, discussed infra. The Maine Supreme Judicial Court (colloquially known as the Law Court) has "limited the application of the discovery rule to three discrete areas: legal malpractice, foreign object and negligent diagnosis medical malpractice, and asbestosis." Johnston, 686 A.2d at 1066 (footnotes omitted). The lessor's case does not fit within these confines and, thus, the common-law discovery rule is not available to salvage the action.

Although what we have said to this point defenestrates Rared's claim for breach of fiduciary duty, Rared nonetheless asserts that a statutory tolling provision rescues its claim of misrepresentation. This provision states:

> If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action . . . .

Me. Rev. Stat. Ann. tit. 14, § 859.

The lessor's argument that this provision extends the time for commencement of its misrepresentation action rests, in part, on its ability to bring a claim for fraud under section 551 of the Restatement. Restatement (Second) of Torts § 551 (1977). Although the Law Court has not adopted section 551, the lessor urges that it would do so if presented with the question.

-10-

Section 551 imposes liability for nondisclosure if there is a duty to "exercise reasonable care to disclose the matter." Id. It delineates five circumstances in which this duty arises. Id. Despite the lessor's importuning that Maine would adopt section 551, the fact remains that some portions of section 551 contemplate liability for a broader range of nondisclosures than are contemplated by Maine's existing case law. Falling into this category is the provision upon which the lessor chiefly relies, which imposes liability for nondisclosure of "basic facts to the transaction" if the party "knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts." Id. § 551(2)(e).

Although the Law Court has at times embraced other provisions of the Second Restatement of Torts, see, e.g., Rand v. Bath Iron Works Corp., 832 A.2d 771, 774 (Me. 2003) (citing Restatement (Second) of Torts § 552 (1977)), it has neither adopted section 551 nor cited that provision in any reported case. By the same token, nothing in any of the Maine cases foretells a willingness to expand the range of liability for misrepresentation to the broader precincts patrolled by section 551.

While section 551 may have much to recommend it, so does a rule that requires sophisticated parties to a commercial

transaction to read documents before signing them. In all events, as a federal court sitting in diversity jurisdiction, we ought not "stretch state precedents to reach new frontiers." Porter v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990). Concerns both of prudence and of comity argue convincingly that a federal court sitting in diversity must hesitate to chart a new and different course in state law. See Kassel v. Gannett Co., 875 F.2d 935, 949-50 (1st Cir. 1989).

These tenets have especial force here. In Maine, there is a well-developed body of case law concerning misrepresentation by nondisclosure. See, e.g., McGeechan v. Sherwood, 760 A.2d 1068, 1081 (Me. 2000); Fitzgerald v. Gamester, 658 A.2d 1065, 1069 (Me. 1995). These cases provide clear rules for determining when and to what extent a defendant will incur tort liability for nondisclosure. The existence of this intricate web of rules, none of which either implicates or invites the application of section 551, counsels against an assumption that Maine will establish a new frontier by embracing that Restatement provision. See, e.g., Kassel, 875 F.2d at 949-50.

The sockdolager is that Rared chose to bring its action in the federal court. Where, as here, a party asserting a state-law claim eschews an available state forum in favor of a federal forum, it scarcely can be heard to complain when the federal court follows existing state precedent and refrains from blazing a new

-12-

and more adventurous jurisprudential trail.  See, e.g., Jones v. Secord, 684 F.3d 1, 11 (1st Cir. 2012); Porter, 913 F.2d at 40-41; Kassel, 875 F.2d at 949-50.  We therefore decline to weave section 551 of the Restatement into the existing fabric of Maine law.

This leaves the question of whether the lessor has a cause of action for fraud under the well-established Maine precedents governing tort liability for fraudulent nondisclosure. In Maine, a plaintiff may bring an action for fraud where the defendant

> (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

Grover v. Minette-Mills, Inc., 638 A.2d 712, 716 (Me. 1994).

In this instance, the alleged misrepresentation consists of an omission: Rite Aid's failure affirmatively to respond to Dubord's mistaken assumption regarding the lease terms.  For a "failure to disclose [to rise] to the level of a misrepresentation, the plaintiff must prove either (1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an

-13-

affirmative duty to disclose." Fitzgerald, 658 A.2d at 1069.[4] Thus, we focus the lens of our inquiry on these two elements.

It is clear beyond hope of contradiction that Rite Aid did not actively conceal the prescription exclusion. To the contrary, Rite Aid submitted the lease to Rared with the exclusion in place. The fact that Dubord did not read the lease to learn the truth about the change in terms does not mitigate the fact that the truth was disclosed.

Scrambling to parry this thrust, the lessor insists that failing to disclose a material fact that induces another to act, with awareness of the nondisclosure, provides prima facie proof of active concealment. But the only authorities upon which the appellant relies for this proposition, Fitzgerald, 658 A.2d at 1069 and McGeechan, 760 A.2d at 1081, will not bear the weight that it loads upon them. In each of those cases, the undisclosed material fact was not readily ascertainable by the party asserting the fraud claim. See Fitzgerald, 658 A.2d at 1069 (explaining that sellers failed to inform buyer that the well on the property was contaminated); McGeechan, 760 A.2d at 1081-82 (noting that buyers' broker did not reveal her interest in the property for sale and

_____

[4] The Fitzgerald court apparently used the term "specific relationship" as a synonym for the more familiar term "special relationship." This is evident from Fitzgerald's citation to H.E.P. Dev. Grp., Inc. v. Nelson, which like other Maine cases uses the term "special relationship." See Fitzgerald, 658 A.2d at 1069 (citing H.E.P. Dev. Grp., Inc. v. Nelson, 606 A.2d 774, 775 (Me. 1992)).

-14-

induced buyers to discuss the terms of their offer so that she could tailor her own competing offer). When, however, the undisclosed fact is known all along to the allegedly defrauded party, or should have been obvious to him, an action for fraud will not lie. See Kezer v. Mark Stimson Assocs., 742 A.2d 898, 905 (Me. 1999); Letellier v. Small, 400 A.2d 371, 376 (Me. 1979). The case at hand fits squarely within this framework.

The lessor tries to turn this framework to its advantage through the use of Letellier. It contends that a party may actively conceal the truth (here, the change in the percentage rent formula) even when the complainant has "constructive notice" of the truth. This contention overreads Letellier. There, the seller lied to the buyers about certain restrictions on the purchased property. Letellier, 400 A.2d at 373. Even though the buyers could have learned about the restrictions by consulting a public record mentioned in the deed, the court found liability, concluding that the buyers were not responsible for "investigating the truth or falsity of the representation." Id. at 376. The Law Court added, however, that liability for misrepresentation would not attach if the falsity was "obvious." Id. Letellier thus presents a situation altogether different from the case at hand: the contract in that case did not disclose the restrictions, but instead referenced an exogenous document containing the truth. Here, however, there was no need to reach out for any exogenous

document; the truth was obvious on the face of the lease indenture itself. The lessor was on notice and cannot credibly claim that the changed term was hidden, inaccessible, or required any supplemental investigation.

Rared's last-ditch position is that there was a special relationship between the parties that imposed upon Rite Aid an affirmative obligation to call the changed term to Dubord's attention. For support, it points to evidence of the parties' positive business dealings over the years and the friendly personal relationship that Dubord had cultivated with several Rite Aid officials and attorneys. While this evidence highlights the alleged unsavoriness of Rite Aid's conduct, it is insufficient to ground a finding of a special relationship.

Maine law is clear-cut concerning the nature of the relationship required to trigger an affirmative duty to disclose: "absent a fiduciary or confidential relationship, there is no duty to disclose information." Brae Asset Fund, L.P. v. Adam, 661 A.2d 1137, 1140 (Me. 1995). A fiduciary or confidential relationship is shown by "the actual placing of trust or confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation." Diversified Foods, Inc. v. First Nat'l Bank of Bos., 605 A.2d 609, 614 (Me. 1992) (quoting Ruebsamen v. Maddocks, 340 A.2d 31, 35 (Me. 1975)).

In this instance, both the lessor and the lessee are sophisticated business entities, well-versed in the field of commercial real estate. They engaged in an arm's-length transaction, and each of them was represented by counsel at all material times. There was no measurable disparity of influence. This, in itself, negates the claim that a special relationship existed; and without such a relationship, Maine law does not impose an affirmative duty to disclose.

The lessor urges us to find that the term "special relationship" is expansive enough to include close business relationships (like the one that existed here) as well as fiduciary and confidential relationships. We reject this exhortation. The Maine cases supply no principled basis for an inference that a legally cognizable "special relationship" is created whenever two parties enjoy a sustained course of amicable business dealings. Notably, the Law Court rejected a similar argument in Eaton v. Sontag, 387 A.2d 33 (Me. 1978), explaining:

> The authorities do agree that friendship between the parties to a transaction in itself is not sufficient to show a confidential relation.
> The expression "confidential relation" . . . has not been construed to include the relationship of vendor and vendee or seller and purchaser merely because the parties to the transaction had known each other for some time and both or either were favorably impressed with the other.
> . . . That the parties believed in their mutual honesty, sincerity and truthfulness on account of their social

> intercourse is not sufficient to constitute a confidential relationship . . . .

Id. at 37 (citation omitted).

## III.  CONCLUSION

On summary judgment, we must take the facts of record in the light most favorable to the nonmoving party. See Certain Interested Underwriters at Lloyd's, 680 F.3d at 65.  Rite Aid's conduct, as the lessor describes it, is nothing to be proud of. Such sleight of hand may well be deserving of opprobrium, but statutes of limitations serve a valuable purpose, and tawdry (but not fraudulent) conduct, without more, is not a sufficient reason to ignore them.  Even when a party to a commercial transaction acts unattractively, the victim has an obligation to make at least some effort to appraise its rights and act upon them in a timely manner. In this regard, the Law Court has taken pains to note that when a contracting party signs "a document without reading, examining, and understanding it, no one is responsible for the fact excepting himself, and no court can protect him or any other person competent to contract from the result of that particular form of carelessness." Elliott S. Peterson Co. v. Parrott, 152 A. 313, 314 (Me. 1930).  So it is here.

We need go no further.  For the reasons elucidated above, we conclude that the district court appropriately determined that Rared's action was brought too late.

**Affirmed**.

-18-