# United States Court of Appeals
## For the First Circuit

No. 23-1168

BRIAN SMITH,

Plaintiff, Appellant,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

Before

Rikelman, Lipez, and Thompson,
Circuit Judges.

George E. Lieberman, with whom Gianfrancesco & Friedemann was on brief, for appellant.
Ian H. Morrison, with whom Seyfarth Shaw LLP was on brief, for appellee.

December 6, 2023

**RIKELMAN**, <u>Circuit Judge</u>.  Brian Smith sued Prudential for breach of fiduciary duty after it terminated his long-term disability benefits under an insurance policy it issued.  Although the policy specified a three-year limitations period to file a lawsuit, it also, inexplicably, started the limitations clock on the date Smith was required to submit proof that he was disabled, <u>not</u> on the date Prudential allegedly breached the policy by stopping payment.  As a result, the clock had already run out by the time Smith sued.

Smith now appeals from the entry of summary judgment against him on the ground that his lawsuit was filed too late.  He asks us to reverse based on three arguments litigated by the parties below but not addressed by the district court, including a potentially winning argument that enforcing the limitations scheme in this case would violate Rhode Island public policy.  There are compelling reasons for concluding that the limitations scheme here may indeed run contrary to Rhode Island public policy, and holding so would mean a ruling in Smith's favor.  But because we believe that reversing and remanding on that ground arguably would amount to an expansion of Rhode Island law, we certify the public policy question to the Rhode Island Supreme Court.

## I.    BACKGROUND

### A.    Relevant Facts[1]

Brian Smith, a Rhode Islander, was an accountant and vice president for tax operations of Comverse Technology when he began experiencing symptoms of cognitive decline in 2015. After a neuropsychologist diagnosed Smith with mild cognitive impairment, Smith sought the care of an occupational physician, who determined that Smith could no longer work as a tax professional. Smith left his job on October 31, 2015.

Shortly thereafter, Smith filed a timely claim for benefits under his long-term disability policy with Prudential. Prudential approved his claim and began paying Smith on January 30, 2016. Smith received a monthly benefit of $3,000 for nearly two and a half years until Prudential notified him on May 3, 2018, that his benefits had been terminated effective the next day. After exhausting his right to internal appeals with Prudential, Smith received his final denial notice on August 28, 2019.

Smith's insurance policy does not include a single, stand-alone provision specifying a date by which Smith had to sue Prudential after a denial or termination of benefits. Instead, it includes a mystifying six-step calculation ("the limitations

---

[1] Because Smith appeals from a grant of summary judgment to Prudential, we construe the facts in the light most favorable to him as the non-moving party. Minturn v. Monrad, 64 F.4th 9, 14 (1st Cir. 2023).

scheme") requiring Smith and other beneficiaries to piece together disparate provisions and information from four documents.[2] We have previously characterized limitations schemes nearly identical to the one in this case as "labyrinthine" and "designed to confuse." Santana-Díaz v. Metro. Life Ins. Co., 816 F.3d 172, 176 n.3, 181 n.10 (1st Cir. 2016).

The puzzle here begins with this clause in the policy:

> You can start legal action regarding your claim 60 days after proof of claim has been given and up to 3 years from the time proof of claim is required, unless otherwise provided under federal law.

(Emphasis added.) On a separate page, the policy states that proof of claim must be submitted "no later than 90 days after your elimination period ends." Still another section of the policy states that an elimination period is a fixed duration during which a beneficiary must show "continuous disability." Under the policy, the elimination period may be 13 weeks or 26 weeks depending on whether the beneficiary is enrolled in an "Option 1" or "Option 2" plan. The fact that Smith was part of an Option 1 plan is specified

---

[2] The four documents are: a Certificate of Coverage, a Claims and Appeals addendum (which, by its terms, is "not part of the . . . Certificate"), the letter initially approving Smith's long-term disability claim, and a Group Contract between J.P. Morgan Chase and the American Institute of Certified Public Accountants (AICPA) Trust, of which Smith is a beneficiary. Under the Group Contract, Prudential provides long-term disability insurance to beneficiaries of the trust, including Smith, and Smith's individual insurance policy incorporates the Group Contract. The Group Contract includes a provision stating that it is governed by New York law.

- 4 -

in yet another, separate document: the letter approving his benefits. So, to sum up the first four steps of the calculation: For Option 1 plan participants like Smith, legal action must be brought within three years of the expiration of the 13-week elimination period, plus 90 days. In total, that is roughly three-and-a-half years from the date the beneficiary ceases working.

The math continues: Two more steps are necessary to calculate the ultimate deadline for filing a lawsuit. When Prudential denies benefits -- or, as for Smith, approves benefits but later terminates them -- the policy affords a beneficiary two opportunities for internal administrative review, described in a separate addendum. First, a beneficiary has 180 days from the date of a denial or termination notice to file an internal appeal, to which Prudential must respond within 45 days. If Prudential denies the initial appeal, then a beneficiary may file a second appeal, again within 180 days, to which Prudential must also respond within 45 days. While Prudential reviews the second appeal (although not the first) the company agrees to toll the limitations period. Hidden within the policy is the fact that although the second appeal is voluntary, the first appeal is mandatory and must

be exhausted before a beneficiary can sue.[3]  Even an accountant could find it challenging to piece this formula together.

We now turn our focus to how the limitations math added up for Smith.  Smith ceased work because of his disability on October 31, 2015, starting the clock on his 13-week elimination period, which ended January 30, 2016.  His proof of claim was due 90 days later, or by April 29, 2016.  So under the policy, not taking into account any internal appeals, Smith's window to sue would have expired three years later, on April 29, 2019.

After initially paying benefits for over two years, Prudential terminated Smith's disability payments effective May 4, 2018.  Smith's mandatory first appeal was due 180 days later, on October 31, 2018.  He timely filed that appeal on July 2, 2018, and Prudential notified him that it stood by its termination on November 13, 2018.  Smith then had another 180 days to file a second, voluntary internal appeal, making that request due May 12, 2019.[4]  He timely sought that review on March 1, 2019, and on

---

[3] The policy provides that if a beneficiary "elect[s] to initiate a lawsuit without submitting to a second level of appeal, the plan waives any right to assert that you failed to exhaust administrative remedies," but contains no such waiver for the first appeal.

[4] Had Smith taken the full 180 days allowed under the policy to submit his second appeal, the limitations period would have already run by the time he submitted it, underscoring the "Alice in Wonderland effect," see infra, of running a limitations period before a claim accrues.

August 28, 2019, Prudential reaffirmed its termination.[5] Note that Prudential's ultimate denial of benefits in August was roughly four months _after_ the deadline to sue indicated by the first four steps of the limitations scheme.

Prudential suggests that after it rejected the second appeal, Smith still had six months to bring suit under the tolling provision that applies to the second, voluntary appeal. The plain language of the policy, however, indicates that Smith only had about eight weeks to sue after Prudential completed its second review.[6] But although the shorter period available to Smith

---

[5] The policy specifies that an appeal is "deemed denied" if Prudential doesn't respond to an appeal request within 45 days. Prudential exceeded the 45-day deadline in deciding both of Smith's internal appeals, so the tolling during Smith's second appeal may have expired not 180 days after Smith requested the second appeal, but only 45 days after. The parties do not raise this point.

[6] Prudential's suggestion that Smith still had six months to sue is at odds with the ordinary operation of a tolling agreement. The tolling clause states that, "[i]f you elect to submit the dispute to the second level of appeal, the plan agrees that any statute of limitations or other defense based on timeliness _is tolled during the time that the appeal is pending_." (Emphasis added.) Tolling "stop[s] the running of" a limitations period, which restarts when the tolling period ends. _Toll_, _Black's Law Dictionary_ (10th ed. 2014). By our math, the tolling provision paused the limitations period on March 1, 2019, when Smith filed his second appeal. This was about eight weeks before the limitations period was otherwise scheduled to end on April 29, 2019. When his second appeal was denied and the clock restarted on August 28, 2019, Smith had, at best, only eight weeks to sue. Prudential suggests that this calculation would "mak[e] Smith's lawsuit even more untimely," but we see it as underscoring the concerns presented by a limitations scheme that runs from a date other than when a cause of action accrues.

highlights the unfairness of barring Smith's breach of fiduciary duty claim, the legal arguments he presents on appeal do not turn on the difference.

No provision of the policy addresses the basic fact that a beneficiary does not have a cause of action against their insurer until the insurer denies or terminates benefits.  As Smith lays out in his brief, the rub of the limitations scheme is that Prudential can initially approve benefits after the limitations period has already begun to run, then terminate them six months, six weeks, or six days before the confusing limitations scheme expires -- or any time thereafter.

## B.    Legal Proceedings

Smith sued Prudential for breach of fiduciary duty on March 12, 2021, within three years of when Prudential stopped paying his disability benefits.  After Prudential moved to dismiss the case as time-barred, the district court permitted limited discovery on one of Smith's counterarguments: that the Employee Retirement Income Security Act of 1974 (ERISA) governed the policy, making the lawsuit timely.  Once discovery concluded, the parties cross-moved for summary judgment on the timeliness of Smith's complaint.

In his motion, Smith argued that ERISA applied to the policy, but he also pursued several state law arguments for why, even if it did not, his breach of fiduciary duty claim was not

- 8 -

time-barred. Prudential responded to the substance of each of Smith's arguments, and the district court ultimately granted summary judgment to Prudential on its timeliness defense. But although Smith had opposed Prudential's motion for summary judgment on five separate legal grounds, the district court evaluated only two of them, both related to ERISA, and concluded that Smith had produced no evidence that his policy was governed by ERISA. It did not address Smith's separate state law defenses as to timeliness or his argument that the contract by its express terms is limited by federal law principles.

Smith timely appealed. We have appellate jurisdiction under 28 U.S.C. § 1291 to consider all of Smith's arguments opposing Prudential's motion for summary judgment, including his state law arguments. The district court had diversity jurisdiction to consider those arguments even after finding that Smith's plan was not governed by ERISA. 28 U.S.C. § 1332(a)(1).

Before this court, Smith expressly waives each of the two ERISA-related arguments ruled on by the district court. But he presses the three other preserved arguments that the district court, without explanation, did not reach.[7] Among these is Smith's

---

[7] We note that Smith's almost exclusive focus on his ERISA argument at the motion to dismiss stage, which led to discovery on his ERISA claim, may have contributed to the district court overlooking his state law arguments on his cross-motion for summary judgment.

argument that enforcing the limitations scheme here to bar him from bringing suit would violate Rhode Island public policy.

## II.    STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo.  Minturn v. Monrad, 64 F.4th 9, 13 (1st Cir. 2023).  In doing so, we consider all facts and draw all reasonable inferences from those facts in the light most favorable to the non-moving party, here Smith.  Id. at 14.

On appeal, Smith urges us to consider three legal arguments never addressed by the district court, including two based on Rhode Island state law.  When sitting in diversity jurisdiction, we look to state law for the substantive rules of decision governing state law arguments.  Fithian v. Reed, 204 F.3d 306, 308 (1st Cir. 2000) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  Our goal is to predict how the state's highest court would rule on the legal questions before us, "even if our independent judgment on the question may differ."  Aubee v. Selene Fin. LP, 56 F.4th 1, 4 (1st Cir. 2022) (quoting Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996)).  "[W]e seek guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law."  Id.

### III.   DISCUSSION

Prudential asks us to evaluate each of Smith's three arguments on appeal and affirm the district court's summary judgment ruling on other grounds.  After careful review, we find no merit in two of Smith's arguments.  But because Smith has raised a non-frivolous claim that enforcing the limitations scheme here would violate Rhode Island public policy, and because we conclude that so holding arguably would expand Rhode Island law, we certify the last issue to the Rhode Island Supreme Court.  See In re Hundley, 603 F.3d 95, 98 (1st Cir. 2010) (acknowledging that we may certify "on our own motion when neither party has requested certification").  We consider each of Smith's arguments on appeal below, leaving the most complicated for last.

A. **Smith's continued attempts to apply ERISA to the policy are waived and, in any case, unpersuasive.**

Despite Smith's express waiver of his claims based on ERISA, he continues to insist on appeal that his policy's limitations scheme is invalid under federal law and supports that argument solely by invoking ERISA.[8]  In particular, he points to the provision stating that the policy's specified limitations

---

[8] As Smith's opening brief states, he "does not challenge in his appeal the District Court's rulings that ERISA does not control the Policy or that Prudential was not bound to follow its internal policy of applying the ERISA claims procedures to both its ERISA and non-ERISA policies."

- 11 -

period applies "unless otherwise provided under federal law." To avoid treating this phrase as surplusage, Smith invites us to hold that "unless otherwise provided under federal law" imports ERISA requirements into his policy. Smith further contends that the limitations scheme would be invalid under those requirements, as interpreted by our precedents, because his denial letter omitted the precise deadline by which Smith had to sue. See Santana-Díaz, 816 F.3d at 179-82 (interpreting 29 C.F.R. § 2560.503-1(g)(1)(iv) to require denial notices to include the time limit for bringing a civil action).

In staking out this position, Smith ignores that he expressly waived his argument that ERISA covers his policy or that Prudential was otherwise required to apply ERISA procedures to his claim. And during oral argument, Smith could not point to any federal law other than ERISA that could be the subject of this clause, and instead reiterated his waived arguments that the policy is governed by ERISA or its regulatory requirements. Even if this precise argument were not waived, the fact that the policy includes the phrase "unless otherwise provided under federal law" does not require us to import ERISA protections into Smith's concededly non-ERISA policy. See Alston v. International Association of Firefighters, Local 950, 998 F.3d 11, 25 n.3 (1st Cir. 2021) (addressing waived argument for "sake of completeness"). The record reflects that Prudential issues policies that are subject

to ERISA, as well as policies that are not.  As the district court recognized and Smith concedes, ERISA covers benefit plans "established or maintained by an employer or by an employee organization."  29 U.S.C. § 1002(1).  The language "unless otherwise provided" in Smith's long-term disability policy indicates that federal law may require departure from the limitations clause for some of Prudential's policies -- those sponsored by an employer or employee organization.  Concluding that Smith's is not such a policy does not deprive the limitations clause of its due meaning.

**B. Smith cannot read the limitations scheme out of the policy.**

Next, relying on a single case, Smith turns to state law and contends that Rhode Island's ten-year statute of limitations for breach of contract claims, not the policy's limitations scheme, should apply here, making his claim timely.  In Smith's view, the Rhode Island Supreme Court has held that when a contract "does not clearly specify either the choice of forum or the statute of limitations that would apply to the case," then the courts must use an interest-weighing approach to determine the applicable statute of limitations.  Webster Bank v. Rosenbaum, 268 A.3d 556, 562 (R.I. 2022).

Smith's argument likely overreads Webster Bank.  See id. at 561-62 (indicating that the absence of a clause selecting a preferred forum or statute of limitations is not dispositive in

- 13 -

deciding whether to proceed to an interest-weighing analysis). But even on Smith's reading, the policy here is unlike the mortgage agreement at issue in that case. As Prudential's brief argues, that agreement called for an interest-weighing analysis to identify the applicable limitations window because the agreement "d[id] not clearly specify . . . the statute of limitations that would apply to the case" or contain any contractual limitations period. See id. at 562. Smith's policy, although in a very confusing fashion, does contain a contractual limitations period.

**C. Rhode Island law likely governs, and we certify Smith's remaining argument to the Rhode Island Supreme Court because enforcing the limitations scheme to bar Smith's lawsuit may violate Rhode Island public policy.**

Finally, Smith argues that Rhode Island law should apply to his long-term disability policy with Prudential and that if it does, enforcing the limitations scheme to bar this lawsuit would violate Rhode Island public policy. In particular, he contends that several Rhode Island Supreme Court decisions, and a provision in the Rhode Island Constitution cited in some of those decisions, indicate that running the contractual limitations period before Smith's claim against Prudential even accrued would violate public policy. Applying that principle here, Smith argues that Prudential should have been denied summary judgment on its timeliness defense.

We agree that Rhode Island law likely governs the policy. Applying Rhode Island law, we also conclude that Smith has raised a non-frivolous argument that enforcing the limitations scheme to bar him from even filing suit would violate Rhode Island public policy. But because there is no controlling precedent directly on point, the public policy question is dispositive of this appeal, and reversal on this ground arguably would expand Rhode Island law, we certify the question to the Rhode Island Supreme Court.

### 1. Rhode Island law governs this policy.

To begin, we must evaluate whether Rhode Island law applies at all, as Smith contends, given that the policy expressly subjects itself to New York law. It is true that we may "avoid [a] 'conflicts' question" if there is "no reason to believe [the contending states' laws] differ[] in any relevant respect," as Prudential suggested at oral argument. In re Pioneer Ford Sales, Inc., 729 F.2d 27, 31 (1st Cir. 1984). But because Smith has pointed to several unique aspects of Rhode Island law, including an open-courts provision in the Rhode Island Constitution that New York's constitution lacks, see infra, we have good reason to believe this case may turn on the conflict between the two states' laws, and so this issue requires our attention. We conclude that Rhode Island law likely applies, as we explain momentarily. Nevertheless, we defer to the ultimate view of the Rhode Island Supreme Court should it decide to seek additional briefing on the

- 15 -

enforceability of the choice-of-law clause under Rhode Island's conflict of law principles.

When analyzing choice-of-law issues, federal courts sitting in diversity apply the substantive law of the forum state, here Rhode Island, including its conflict of laws rules. See Fithian, 204 F.3d at 308 (citing Erie R.R. Co., 304 U.S. at 78). Rhode Island law generally permits parties "to agree that the law of a particular jurisdiction will govern their transaction." Terrace Grp. v. Vt. Castings, Inc., 753 A.2d 350, 353 (R.I. 2000) (quoting Sheer Asset Mgmt. Partners v. Lauro Thin Films, Inc., 731 A.2d 708, 710 (R.I. 1999) (per curiam)); see also Owens v. Hagenback-Wallace Shows Co., 192 A. 158, 164 (R.I. 1937). But that presumption is not ironclad.[9] See Com. Park Realty, LLC v. HR2-A Corp., 253 A.3d 1258, 1270 (R.I. 2021) (endorsing exceptions provided under Restatement (Second) of Conflict of Laws § 187(2)

_____

[9] At oral argument, Prudential suggested that Restatement (Second) Conflict of Laws § 187(1), which enforces choice-of-law clauses "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue," requires application of New York law. Restatement (Second) of Conflict of L. § 187(1) (Am. L. Inst. 1971). We disagree that section 187(1) would apply to the question Smith presents here: whether the limitations scheme is valid under Rhode Island public policy. The parties could not have "resolved" whether the limitations scheme is invalid on public policy grounds "by an explicit provision in their agreement." Id. § 187(1) & cmt. d. Instead, whether we should apply New York law to the "validity" of a contract is governed by section 187(2) and its exceptions. Id. § 187(1) cmt. d; see also Com. Park Realty, LLC v. HR2-A Corp., 253 A.3d 1258, 1270-72 (R.I. 2021).

(Am. L. Inst. 1971)); Owens, 192 A. at 164.  Rhode Island does not enforce choice-of-law clauses if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice."[10] Com. Park, 253 A.3d at 1270 (quoting Restatement (Second) of Conflict of L. § 187(2)(a) (Am. L. Inst. 1971)).  In the absence of an effective choice by the parties, Rhode Island enforces the law of the state with the "most significant relationship" to the contract under section 188 of the Restatement.  Id. at 1271 (quoting Restatement (Second) of Conflict of L. § 188(1) (Am. L. Inst. 1971)).

Here, New York bears "no substantial relationship to the parties or the transaction," and Prudential has not offered any "other reasonable basis for the parties' choice."  Id. at 1270 (quoting Restatement (Second) of Conflict of L. § 187(2)(a) (Am.

---

[10] Rhode Island also declines to enforce choice-of-law clauses if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties."  Com. Park, 253 A.3d at 1270 (quoting Restatement (Second) of Conflict of L. § 187(2)(b) (Am. L. Inst. 1971)).  If Smith is correct that enforcing the limitations clause violates Rhode Island public policy, then New York law would likely be inapplicable under section 187(2)(b) as well.  Id. at 1271.  But we do not reach section 187(2)(b) because we are satisfied that the clause is unenforceable under section 187(2)(a) and because doing so would require assuming the conclusion of the public policy question on which we certify.

L. Inst. 1971)). Rhode Island law recognizes a substantial relationship to the chosen state if the state is (1) "the place of performance of one of the parties," (2) "the domicile of one of the parties," or (3) "the principal place of business of a party." Sheer Asset, 731 A.2d at 710.

Prudential's sole argument for New York's relationship to the parties and the contract is that the Group Contract states that it was "delivered in" New York, suggesting New York is the place of contracting. Prudential argues that it "did not issue an individual insurance policy to Smith in Rhode Island; rather, [it] entered into a group contract of insurance with the AICPA trust, which was delivered in the state of New York." But it cites no law for its assertion that the group policyholder (the AICPA trust), rather than the individual policyholder (Smith), is the insured to whom delivery establishes the place of contracting. Even assuming that the delivery of the Group Contract, rather than Smith's individual insurance certificate, were the relevant point of analysis under section 187(2)(a), Rhode Island has not recognized the location of delivery of a contract as suggesting a substantial relationship to the chosen state. See Com. Park, 253 A.3d at 1271 (relying on lender's domicile and principal place of business to conclude that Massachusetts had a substantial relationship to the loan at issue); Sheer Asset, 731 A.2d at 710 (relying on lender's domicile and principal place of business to

- 18 -

establish that Connecticut had a substantial relationship to the loan agreement at issue).

Nor does New York bear any other relationship to the parties or the policy recognized by Rhode Island law. The record does not show that either party performed any obligations under the contract in New York, nor has Prudential argued otherwise; neither party is domiciled in New York (Prudential is domiciled in New Jersey); and Prudential's principal place of business is Newark, New Jersey.

Having determined that New York bears no substantial relationship to the case under section 187(2)(a), Rhode Island law requires that we next probe which state has the "most significant relationship" to the contract under section 188. Com. Park, 253 A.3d at 1271 (quoting Restatement (Second) of Conflict of L. § 188(1) (Am. L. Inst. 1971)). Rhode Island's applicable test balances five factors: (1) "the place of contracting"; (2) "the place of negotiation of the contract"; (3) "the place of performance"; (4) "the location of the subject matter of the contract"; and (5) "the domicile, residence, nationality, place of incorporation and place of business of the parties." Id. (citing Restatement (Second) of Conflict of L. § 188(2) (Am. L. Inst. 1971)).

We think the balance of these factors indicates that a Rhode Island court would apply domestic law in this case. First,

- 19 -

the record contains little evidence of the place of contracting between Smith and Prudential. The second factor is also indeterminate here, as contracts of adhesion involve little negotiation. But the remaining three factors point toward Rhode Island. Prudential performed under the contract in Rhode Island by paying benefits to Smith there for more than two years. Smith also experienced his disability in Rhode Island and Massachusetts, where he worked, not New York. And Smith is domiciled in Rhode Island and resides there.

Other record evidence also suggests Prudential understood Rhode Island's relationship to the contract. For example, both of Prudential's denial letters advised Smith that he could request administrative review by the Rhode Island Department of Business Regulation and provided contact information for the department's insurance division.

Prudential contends that the state bearing the "most substantial relationship with the underlying contract" is "New York, where the Group Contract was delivered," citing Baker v. Hanover Insurance Company, 568 A.2d 1023, 1025 (R.I. 1990). Prudential argues in its brief that Hanover "appl[ied] Massachusetts law . . . where [an] insurance policy was executed and delivered in Massachusetts to a Massachusetts corporation whose principal place of business was in Massachusetts, although the insured was a Rhode Island resident." But Prudential misreads

- 20 -

Hanover.  First, Hanover involved a contract that did not include a choice-of-law clause at all, and in such cases, Rhode Island applies a different test than the balancing under Commerce Park that we apply here.  See Webster Bank, 268 A.3d at 560 ("[I]n the absence of a contractual stipulation about which law controls, Rhode Island's conflict-of-law doctrine provides that the law of the state where the contract was executed governs." (quoting DeCesare v. Lincoln Benefit Life Co., 852 A.2d 474, 483-84 (R.I. 2004))).  Second, Hanover involved a car accident between an uninsured motorist and an employee driving a company vehicle owned and insured by a Massachusetts corporation.  568 A.2d at 1024.  Although the employee, a Rhode Island resident, was the plaintiff, the insured was the Massachusetts corporation, not (as Prudential says) the employee.  See id.; Hartford Cas. Ins. Co. v. A & M. Assocs., Ltd., 200 F. Supp. 2d. 84, 87 (D.R.I. 2002) (citing Hanover, 568 A.2d at 1025))).  Smith, the insured here, is a Rhode Island resident, and Hanover does not otherwise alter our conclusion that the remaining factors under Commerce Park weigh in favor of Rhode Island law.  See supra.

**2. Smith raises non-frivolous and dispositive questions under Rhode Island law about the validity of the policy's limitations scheme.**

Having determined that Rhode Island law likely governs the policy, we now address Smith's substantive state law argument. Smith contends that enforcing the limitations scheme to bar his suit would violate Rhode Island public policy. Specifically, he argues that it would contravene fundamental principles of Rhode Island law to permit the limitations scheme to run from a time other than the date that Smith's cause of action against Prudential accrued.[11] In support, Smith relies on a number of Rhode Island Supreme Court cases and Article I, Section 5 of the Rhode Island Constitution. See Kennedy v. Cumberland Eng'g Co., Inc., 471 A.2d 195, 198 (R.I. 1984); Am. States Ins. Co. v. LaFlam, 69 A.3d 831, 845 (R.I. 2013); Com. Park, 253 A.3d at 1271-72 (voiding a choice-of-law clause setting an interest rate above limits permitted by Rhode Island law as against public policy).

In our view, Smith's public policy argument could have merit for four reasons. First, the Rhode Island state courts have often voided or refused to enforce contractual provisions on public

---

[11] Smith's styling of this argument varies at times between directly challenging the limitations scheme as unconstitutional and arguing that its enforcement here would violate public policy, including as reflected in Article I, Section 5 of the Rhode Island Constitution. We treat his argument as one based on the state's fundamental public policy.

policy grounds. See, e.g., Mendez v. Brites, 849 A.2d 329, 338 (R.I. 2004) ("[T]his Court may deem contractual provisions that violate public policy to be unenforceable."). Smith has cited several of those cases in his brief, see supra, but there are many others. See, e.g., NV One, LLC v. Potomac Realty Cap., LLC, 84 A.3d 800, 810 (R.I. 2014) (holding that usury savings clauses violate Rhode Island public policy); Ryan v. Knoller, 695 A.2d 990, 992 (R.I. 1997) (invalidating intoxication exclusions in rental car insurance agreements as a matter of public policy). A number of those cases have voided limitations periods, including in contracts. See LaFlam, 69 A.3d at 845; Kennedy, 471 A.2d at 198; cf. W. Rsrv. Life Ins. Co. v. ADM Assocs., LLC, 116 A.3d 794, 806 (R.I. 2015) (upholding incontestability clause in annuity agreement as consistent with public policy).

Second, the Rhode Island Supreme Court has condemned the "Alice in Wonderland effect" of allowing a limitations period to begin to run before a cause of action even exists and has held that doing so would be "palpably unjust." Kennedy, 471 A.2d at 201 (quoting Wilkinson v. Harrington, 243 A.2d 745, 753 (R.I. 1968)); see also id. ("Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a non-existent railroad. For substantially similar reasons, it has always heretofore been accepted, as a sort

- 23 -

of logical 'axiom,' that a statute of limitations does not begin to run against a cause of action before that cause of action exists, i.e., before a judicial remedy is available to a plaintiff." (quoting Heath v. Sears, Roebuck & Co., 464 A.2d 288, 295-96 (N.H. 1983))).

Rhode Island also has held that, as a "general rule . . . a contract action accrues at the time the contract is breached." LaFlam, 69 A.3d at 841 (quoting Berkshire Mut. Ins. Co. v. Burbank, 664 N.E.2d 1188, 1189 (Mass. 1996)). As the Rhode Island Supreme Court quoted from Burbank: "Prior to the time when the contract is violated there is no justiciable controversy, and it would be illogical to let the statute of limitations for bringing an action begin to run before the action can be brought." Id. (quoting Burbank, 665 N.E.2d at 1189).

In fact, Rhode Island has taken particular umbrage with contractual limitations schemes like the one at issue here, which start the clock "before a justiciable cause of action [against the insurer] may even exist." Id. at 845. Addressing a certified question from this court, LaFlam voided a clause limiting the time to bring a lawsuit for payment under uninsured/underinsured motorist (UM/UIM) coverage that ran from the date of the victim's car accident rather than the date her cause of action against the insurer accrued. Id. at 838. The clause "may have [had] the . . . effect . . . of barring recovery before the insured knows or has

- 24 -

reason to know that she has a UM/UIM claim against her insurer."[12]
Id. (quoting Am. States Ins. Co. v. LaFlam, 672 F.3d 38, 43 (1st
Cir. 2012)).  The court explained:

> [An] insured is not injured by his or her UM/UIM carrier
> and, therefore, has no right to seek judicial relief
> against the insurer unless and until the insurer
> breaches the insurance contract.  "That breach does not
> occur until the insurer refuses payment (or arbitration
> if applicable)."

Id. at 841 (quoting Palmero v. Aetna Cas. & Sur. Co., 606 A.2d
797, 799 (Me. 1992)).  The court concluded that this arrangement
"frustrat[ed] the public policy concerns embodied in the state's
UM/UIM statute," namely, "indemnification for an insured's loss
rather than defeat of his or her claim."  Id. at 845 (quoting
DiTata v. Aetna Cas. & Sur. Co., 542 A.2d 245, 247 (R.I. 1988)).

_____

[12] The Rhode Island Supreme Court agreed with our
characterization of this risk as "unique" and "present in the
UM/UIM context but not in other insurance contexts."  LaFlam, 69
A.3d at 838 (quoting Am. States Ins. Co. v. LaFlam, 672 F.3d 38,
43 (1st Cir. 2012)).  But in our view, the limitations scheme here
creates a remarkably similar dynamic to the scheme at issue in
LaFlam.  Further, what the Rhode Island Supreme Court saw as unique
in UM/UIM motorist coverage is that "it [may] not become clear
that the insured has such a claim until after the insured has
attempted to obtain compensation from the tortfeasor" and
discovered she is underinsured relative to the insured's injury or
loss.  Id. (alteration in original) (quoting LaFlam, 672 F.3d at
43).  As the facts of the present case make clear, Smith could not
have known he had a claim against Prudential under the policy until
it terminated his benefits.  Indeed, in the UM/UIM context, the
motorist arguably would be on notice that the status of the
responsible party's insurance coverage needed to be determined,
whereas Smith had no inkling he would have a "loss" until
Prudential terminated his benefits more than two years after
approving them.

- 25 -

Substituting just a few terms in the <u>LaFlam</u> analysis -- "a long-term disability" claim for "an uninsured motorist" claim and the date "proof of claim was required" for the date "of the accident" -- gives a succinct statement of the problem with the limitations scheme here:

> If the limitations period for [a long-term disability] claim commenced on the date [proof of claim was required], the insurer could potentially deny an insured's claim or refuse payment shortly before the limitations period ends, leaving the insured with insufficient time to file suit. Similarly, the insurer could deny the insured's claim shortly after the limitations period ends, thereby barring the insured from filing suit at all.

<u>Id.</u> at 844-45 (quoting <u>McDonnell</u> v. <u>State Farm Mut. Auto. Ins. Co.</u>, 299 P.3d 715, 733 (Alaska 2013)). The result is that the limitations scheme may extinguish claims before they ever mature into a viable cause of action through no fault of the insured. Here, Prudential's alleged breach did not occur until either August 28, 2019, the date of Prudential's final benefit denial, or November 2018, when Prudential rejected Smith's first mandatory appeal and Smith had therefore satisfied his exhaustion obligations, or at the very earliest in May 2018, when Prudential stopped its benefits payments to Smith. Smith's lawsuit, filed March 12, 2021, was initiated within three years of all of these dates. Yet the limitations scheme drags Smith's claim into untimeliness.

- 26 -

Third, Rhode Island courts view it as a matter of "fundamental [in]justice" to totally "bar adjudication of a claim even before it arises." Kennedy, 471 A.2d at 198-99 (quoting Wilkinson, 243 A.2d at 753). Article I, Section 5 of the Rhode Island Constitution, upon which Smith explicitly relies, has been interpreted to prohibit such a result, at least as applied to a state statute of repose.[13] Id. at 198-201. In response, Prudential has not cited a Rhode Island case suggesting that a public policy argument cannot be based on common law principles or a state constitutional provision, as Smith argues here. See Com. Park, 253 A.3d at 1273 (Robinson, J., dissenting in part) (suggesting that fundamental public policy resides more forcefully in the state constitution than in statutes).

In Kennedy, the Rhode Island Supreme Court held unconstitutional a statute of repose that barred product liability claims filed more than ten years after the date the product "was first purchased for use or consumption," regardless of the date of

---

[13] Article I, Section 5 gives any person within the state access to a judicial remedy:

> Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property, or character. Every person ought to obtain right and justice freely, and without purchase, completely and without denial; promptly and without delay; conformably to the laws.

R.I. Const. art. I, § 5.

an individual's injury. 471 A.2d at 197 (quoting R.I. Gen. Laws § 9-1-13(b)). The court objected to the running of a limitations period before the plaintiff "at least discovered, or should have discovered, his or her injury." Id. at 199. Although Kennedy theoretically still had one year left to sue under the statute of repose at the time of his injury, the court was particularly concerned that in future cases, "[p]laintiffs may be absolutely barred from court through no carelessness or fault of their own because they were injured by products that did not manifest their defects until after they were ten years old."[14] Id. at 200. The court invalidated the statute of repose under Article 1, Section 5, finding Kennedy's claim timely because to hold otherwise would be "palpably unjust." Id. at 199 (quoting Wilkinson, 243 A.2d at 753); see also id. (remarking that such limitations periods also waste litigants' and courts' resources by encouraging the filing of premature claims to preserve any chance of recovery).

Fourth, the Rhode Island Supreme Court has made clear that "the determination of whether a particular contract provision violates public policy is case-specific," LaFlam, 69 A.2d at 835, and the facts of this case are troubling. As discussed above, Prudential argues that the three-year limitations period here

---

[14] Kennedy was unable to determine when the statute of repose began to run until the defendant's responses to interrogatories revealed the date the product was first purchased. Kennedy, 471 A.2d at 199.

- 28 -

began to run in April 2016, more than two years before Smith could possibly know Prudential would deny his benefits. Indeed, Prudential suggests that the limitations period began to run in 2016 even though it was paying benefits to Smith at the time and would continue to do so monthly until May 2018. Adopting Prudential's arguments also would mean that Smith would have been left with only about eight weeks to sue after Prudential's final denial. Prudential has not pointed us to any Rhode Island law permitting such a shortened limitations period.

To be sure, Rhode Island has upheld limitations on the time to bring claims as serving the "salutary purpose[]" of encouraging lawsuits "when events and circumstances are still fresh in the minds of the parties and witnesses." Wilkinson, 243 A.2d at 752 (citation omitted); Renaud v. Sigma-Aldrich Corp., 662 A.2d 711, 717 (R.I. 1995) (upholding three-year limit on injury claims measured from accrual as constitutional). But limits on timeliness are still subject to Rhode Island's public policy and its constitutional bar on "total[ly] den[ying] access to the courts for adjudication of a claim even before it arises." Zab v. R.I. Dep't of Corr., 269 A.3d 741, 748 (R.I. 2022) (first alteration in original) (quoting Kennedy, 471 A.2d at 198).

Prudential also invites us to distinguish Zab and Kennedy on the ground that those plaintiffs' right to sue was "extinguished entirely," unlike here, where Smith had a brief

- 29 -

window of time left to bring suit. We think the facts here are closer to Zab and Kennedy than Prudential does. See supra note 6.

Nevertheless, we agree that neither decision squarely controls this case. Kennedy involved a direct challenge to a state statute of repose under Article 1, Section 5, whereas here, Smith has not challenged the underlying Rhode Island statute on long-term disability claims on which the limitations period is loosely based. And unlike the plaintiff in Kennedy, Smith had six months to bring a timely lawsuit once Prudential decided his first appeal, and eight weeks to sue after it decided his second appeal.

Further, despite the similarities between the impact of the limitations structure in LaFlam and the facts of this case, LaFlam does not control this case either. We agree with Prudential that Smith's insurance policy contains language required under a Rhode Island statute, see R.I. Gen. Laws § 27-18-3(a)(11) (specifying "Required Provisions" for "Accident and Sickness Insurance Policies"), unlike the limitations clause in LaFlam, which was contrary to the Rhode Island statutes providing for UM/UIM coverage, see LaFlam, 69 A.3d at 845. The Rhode Island Supreme Court has not yet weighed in on section 27-18-3(a)(11), so we lack the benefit of its view on the statute's choice of when to start the limitations clock. But whereas the parties in LaFlam only cited statutory and common law principles in their favor, here, Smith invokes Article I, Section 5 as an additional source

- 30 -

of state public policy.  Because the public policy Smith identifies resides, in part, in the Rhode Island Constitution, we disagree with Prudential that section 27-18-3(a)(11) necessarily disposes of Smith's argument.

Prudential mounts two final counterarguments against the timeliness of Smith's claim in support of its request that we affirm on other grounds.  First, Prudential argues that the U.S. Supreme Court has upheld the enforceability of a similar limitations clause in a long-term disability policy.  See Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 107-08 (2013).  Heimeshoff involved an enforceability challenge to a limitations clause in an ERISA policy that, as here, ran for three years from the date proof of loss was due.[15]  Id. at 105.  The Court unanimously held that the limitations clause was enforceable on the ground that it was "reasonable" and was not supplanted by "a controlling statute to the contrary."  Id. at 104 (quoting Order of United Com. Travelers of Am. v. Wolfe, 331 U.S. 586, 608 (1947)).

---

[15] Prudential also cites non-ERISA cases in which courts, including ours, enforced similar limitations clauses.  But these cases do not help Prudential, as none included objections based on Rhode Island public policy.  See LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509-10 (1st Cir. 1998) (denying estoppel claim under Maine law); Kuber v. Prudential Ins. Co. of Am., 819 F. App'x 754, 756 (11th Cir. 2020) (enforcing limitations clause under Delaware contract law).

Heimeshoff does not control this case because Smith's policy is not governed by ERISA. ERISA includes procedural guardrails, including that an insurer explicitly state when a limitations period expires in its denial letter to an insured. 29 C.F.R. § 2560.503-1(g)(1)(iv) (2020). Those protections may render enforcement of the same provision fair when ERISA applies but unfair when it does not. See Santana-Díaz, 816 F.3d at 178-80. Further, absent preemption, "a state constitution" may provide "greater protection" than that available under federal law. Pimental v. Dep't of Transp., 561 A.2d 1348, 1350 (R.I. 1989). Lacking the benefits of ERISA's regulatory safeguards in this case, Smith seeks to avail himself of the protection Rhode Island law may afford him.

Second, Prudential proposes that courts can heed Heimeshoff's instruction to apply "traditional doctrines" like estoppel, waiver, or equitable tolling to reach untimely claims in cases where an "administrator's conduct causes a participant to miss the deadline for judicial review." 571 U.S. at 114. As Prudential acknowledges, however, Smith does not ask for relief under these doctrines. And in any event, the cases Prudential presents involved policies covered by ERISA, under which state public policy arguments would have been unavailable. They do not change our view that Smith may have a meritorious public policy argument under Rhode Island law that he did not sue too late.

- 32 -

**3.** **We certify Smith's public policy argument to the Rhode Island Supreme Court.**

Although we determine that Rhode Island public policy may provide grounds for voiding the limitations scheme here, no state precedent commands that conclusion, and a ruling for Smith arguably would "extend . . . [Rhode Island] law." Hatch v. Trail King Indus., Inc., 656 F.3d 59, 70 (1st Cir. 2011) (quoting Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1186-87 (1st Cir. 1996)). As we have recognized before, "[c]oncerns both of prudence and of comity argue convincingly that a federal court sitting in diversity must hesitate to chart a new and different course in state law." John Hancock Life Ins. Co. v. Abbott Lab'ys, 863 F.3d 23, 36–37 (1st Cir. 2017) (alteration in original) (quoting Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 54 (1st Cir. 2012)). These principles are paramount "when [a] federal action raises difficult questions of state law bearing on important matters of state policy." Growe v. Emison, 507 U.S. 25, 32 (1993) (citing Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 814-17 (1976)).

The case before us "involves major state policy issues that will certainly impact future cases." LaFlam, 672 F.3d at 44 (internal quotation marks omitted) (quoting Real Estate Bar Ass'n for Mass. v. Nat'l Real Estate Info. Servs., 608 F.3d 110, 119 (1st Cir. 2010)). Further clarity on the scope of Rhode Island's

- 33 -

public policy against limitations provisions that run before a cause of action accrues may, at a minimum, have broad implications for the resolution of benefit disputes governed by Rhode Island law. Accordingly, we chart the "prudent course" and seek the guidance of the Rhode Island Supreme Court on whether Rhode Island public policy embraces Smith's argument in this case. Págan-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 18 (1st Cir. 2012) (quoting Ropes & Gray LLP, v. Jalbert (In re Engage, Inc.), 544 F.3d 50, 57 (1st Cir. 2008)); see also In re Hundley, 603 F.3d at 98 (acknowledging that we may certify sua sponte). Rhode Island may consider certified questions from federal courts of appeals if we find "no controlling precedent" on an issue that is "determinative of the pending cause of action," as we find here. R.I. Sup. Ct. R., Art. I, R. 6(a); LaFlam, 672 F.3d at 39.

For these reasons, we certify the following question to the Rhode Island Supreme Court:

> In light of Rhode Island General Laws § 27-18-3(a)(11) and Rhode Island public policy (including Rhode Island Constitution article I, section 5), would Rhode Island enforce the limitations scheme in this case to bar Smith's lawsuit against Prudential?

We welcome the guidance of the Rhode Island Supreme Court on any other relevant aspect of Rhode Island law that it concludes would aid in the proper resolution of this case, including the choice-of-law issue.

The clerk of this court is directed to forward to the Rhode Island Supreme Court, under the official seal of this court, a copy of the certified question and our decision in this case, along with copies of the briefs and appendices filed by the parties in this appeal, which provide all facts relevant to the issue certified. We retain jurisdiction pending the Rhode Island Supreme Court's determination. The case shall be stayed until further order of the court.